590 A.2d 1133

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. MALCOLM ROBBINS, DEFENDANT–APPELLANT.

Argued November 27, 1990—Decided May 30, 1991.

*Matthew Astore,* Deputy Public Defender, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney).

*Edward C. Bertucio, Jr.,* Assistant Prosecutor, argued the cause for respondent (*Paul T. Koenig, Jr.,* Mercer County Prosecutor, attorney).

*Cherrie Madden Black,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal implicates principles of rendition law. We granted certification, 122 *N.J.* 379, 585 *A.*2d 383 (1990), to determine whether defendant, who is serving a life sentence in a New Jersey prison, may be extradited to California to face the death penalty. We affirm the Appellate Division's order denying dismissal of the warrant of extradition and permitting defendant to be extradited to California. We conclude that under the circumstances of this case, the decision to extradite a prisoner is a matter of executive discretion, and that defendant fails to overcome the strong presumption of validity in favor of the warrant of extradition granted by the Governor.

I

In November 1980, New Jersey authorities arrested defendant, Malcolm Robbins, for the sexually-motivated murder of nine-year-old E.B., a crime to which defendant later confessed. On August 7, 1981, Robbins pled guilty to charges of murder, kidnapping, aggravated sexual assault, and other offenses arising from that murder, for which the court sentenced him to an aggregate term of life imprisonment with a forty-year parole disqualifier. Robbins is currently incarcerated in New Jersey State Prison at Trenton.

At the time defendant confessed to the murder of E.B., he also admitted to several other offenses, including the sodomizing and choking to death of a young boy in California. The details of that crime met the description of the June 1980 murder of C.F., a six-year-old boy whose skeletal remains had been found on the campus of the University of California at Santa Barbara. Two officers from the Santa Barbara Sheriff's Department came to New Jersey, where Robbins was incarcerated awaiting trial, to question him about that California murder. When shown a picture of C.F., Robbins admitted, "He's the little boy that I killed."

In November 1981, after defendant had already begun serving his New Jersey life sentence, he was transferred from the New Jersey State Prison at Trenton to California to stand trial for the kidnapping and murder of C.F. A California jury found Robbins guilty of both charges, and the court sentenced him to death. California officials then returned Robbins to New Jersey to continue serving his life sentence here while his appeal from the California conviction and sentence was pending.

The California Supreme Court affirmed defendant's conviction and sentence, *People v. Robbins*, 45 *Cal.*3d 867, 755 *P.*2d 355, 248 *Cal.Rptr.* 172 (1988), and the United States Supreme Court denied certiorari in January 1989. *Robbins v. California*, 488 *U.S.* 1034, 109 *S.Ct.* 849, 102 *L.Ed.*2d 981. Shortly thereafter, California Governor George Deukmejian requested that New Jersey extradite Robbins to allow California to carry out the death sentence. On April 11, 1989, then-Governor Thomas Kean signed the warrant of extradition.

Robbins moved to dismiss the warrant on the grounds that neither the Interstate Agreement on Detainers nor the Uniform Criminal Extradition Act provides for his extradition to California before he completes his New Jersey sentence. The trial court denied defendant's motion, and the Appellate Division affirmed in an unreported opinion. In letting stand the order of extradition the Appellate Division held that whether New Jer-

sey's or California's sentence is the first to be served "is not a matter of interpretation of [the Interstate Agreement on Detainers or the Uniform Criminal Extradition Act]" but rather "a matter of comity between jurisdictions."

## II

### A

Initially we consider Robbins' claim that general principles of extradition law do not contemplate his transfer to California under the circumstances. We acknowledge at the outset that some commentators, beginning with J. Scott, *The Law of Interstate Rendition, Erroneously Referred to as Interstate Extradition* § 1 at 1–5 (1917), have recommended the use of "rendition" for reference to interstate practice and "extradition" for international practice; but at the risk of perpetuating an error that has taken on a life of its own, we use the terms interchangeably in this opinion.

Our analysis begins with the extradition clause of the United States Constitution. "To prevent the states from serving, unwittingly or otherwise, as havens for fugitives from sister states," *In re Basto*, 108 *N.J.* 480, 485, 531 *A.*2d 355 (1987), that clause provides:

> A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime. [*U.S. Const.* art. IV, § 2, cl. 2.]

The extradition clause "served important national objectives of a newly developing country striving to foster national unity." *Michigan v. Doran*, 439 *U.S.* 282, 288, 99 *S.Ct.* 530, 535, 58 *L.Ed.*2d 521, 527 (1978). Because the clause was thought not to be self-executing, Congress enacted the Extradition Act of 1793, 1 *Stat.* 302, to carry its substance into effect. *Roberts v. Reilly*, 116 *U.S.* 80, 94, 6 *S.Ct.* 291, 299, 29 *L.Ed.* 544, 548 (1885). The Federal Rendition Act (the Rendition Act), 18

*U.S.C.* §§ 3181 to 3195, the modern counterpart of the Extradition Act, states in relevant part:

Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. [18 *U.S.C.* § 3182.]

Section 3182's repeated reference to the "executive authority" illustrates the central role that Congress intended governors to play in matters of interstate rendition. At issue here is the extent of the deference to be given a governor's actions in carrying out that central role.

B

In *Kentucky v. Dennison*, 65 *U.S.* (24 *How.*) 66, 16 *L.Ed.* 717 (1861), the Supreme Court held that the extradition clause and the Rendition Act impose on governors of asylum states a mandatory duty to deliver up fugitives on proper demand. For many years, that duty was essentially nothing more than a moral obligation, because *Dennison* also held that the federal courts had no authority to compel extradition. See Comment, *Interstate Rendition: Executive Practices and the Effects of Discretion*, 66 *Yale L.J.* 97, 98–99 (1956). In 1987, however, the Supreme Court overruled *Dennison* and held that federal courts have the power to compel rendition. *See Puerto Rico v. Branstad*, 483 *U.S.* 219, 107 *S.Ct.* 2802, 97 *L.Ed.*2d 187.

██ Despite *Branstad's* restriction on gubernatorial power, rendition remains discretionary if the fugitive demanded is incarcerated in the asylum state for a violation of that state's laws. *See Taylor v. Taintor*, 83 *U.S.* (16 *Wall.*) 366, 371, 21 *L.Ed.* 287, 290 (1873); Note, *The Detainer: A Problem in*

*Interstate Criminal Administration*, 48 *Colum.L.Rev.* 1190, 1200–06 (1948). In that situation, the governor's duty to extradite does not mature until punishment in the asylum state has been completed. *See Nelson v. George*, 399 *U.S.* 224, 229 n. 6, 90 *S.Ct.* 1963, 1966–67 n. 6, 26 *L.Ed.*2d 578, 583 n. 6 (1970). Before the duty matures, "the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy * * * before the other court shall attempt to take it for its purpose." *Ponzi v. Fessenden*, 258 *U.S.* 254, 260, 42 *S.Ct.* 309, 310, 66 *L.Ed.* 607, 611 (1921). As a matter of comity, the governor of the asylum state may choose to extradite such prisoners, and a prisoner "may not complain if one sovereignty waives its strict right to exclusive custody of him for vindication of its laws in order that the other may also subject him to conviction of crime against it." *Ibid.*

## C

■ Robbins had been sentenced and was incarcerated in a New Jersey prison at the time the Governor of California demanded his extradition, making this case one in which the mandatory duty to extradite has not yet matured. In that situation, the majority rule, which we adopt, is that

[t]he executive authority of the asylum state may withhold a rendition request until the fugitive has completed a prison sentence imposed by a court of the asylum state, but this is a matter of executive discretion and not a personal right of the fugitive. * * * [I]t is usually held that the executive of the asylum state may waive the right of that state to retain the prisoner and may surrender him to the demanding state * * * while he is still undergoing, or subject to, punishment in the asylum state. [35 *C.J.S. Extradition* § 11 at 398–99 (1960) (collecting cases).]

Former–Governor Kean thus had the option of immediately extraditing Robbins to California or delaying the extradition until Robbins had completed his New Jersey sentence. He decided to allow California to exact its punishment before New Jersey had fully exacted its own. That exercise of executive discretion was clearly within his authority.

Defendant's assertion that general principles of extradition law limit extradition to situations in which one is transferred to stand trial is without merit. In *Guerrieri v. Maxwell*, 174 *Ohio St.* 40, 186 *N.E.*2d 614 (1962), the Supreme Court of Ohio stated:

[W]here one has placed himself in the position of being wanted at the same time by two different sovereigns for the violation of penal statutes of both, it is a matter for the sovereigns to determine which shall first exact punishment from the offender, and not the offender. Under such circumstances it is the interested sovereigns that make the determination and the offender cannot complain of the order of his trials or punishment for such offenses. [*Id.* at 44, 186 *N.E.*2d at 616.]

Similarly, in *State v. Williams*, 92 *N.J.Super.* 560, 224 *A.*2d 331 (1966), the Appellate Division held:

Inasmuch as it is impossible for a person to be in two places at the same time, where one owes penalties to two separate sovereigns, one sovereign must relinquish its claim and allow the other to exact its penalty first. * * * The order of punishment is a matter to be decided between the sovereigns—it is a matter of comity between them, and the decision arrived at is one over which the convict has no control. [*Id.* at 563, 224 *A.*2d 331.]

Defendant is attempting to delay the imposition of his death sentence in California by using as a shield the fact that he is serving his sentence in New Jersey. He seeks to force New Jersey to carry out its full punishment. This he cannot do. "He owe[s] a debt to two different sovereigns. Under our law these debts must be paid, and it is not up to the accused to determine in what order they should be paid." *Guerrieri, supra*, 174 *Ohio St.* at 46, 186 *N.E.*2d at 618.

## D

█ When a governor has exercised discretion to grant extradition, "judicial inquiry on a habeas corpus proceeding is limited to whether the extradition documents are on their face in order, whether the prisoner has been charged with a crime in the demanding state, whether the prisoner is the person requested for rendition, and whether the prisoner is a fugitive from the demanding state." *Basto, supra*, 108 *N.J.* at 488, 531 *A.*2d 355 (citing *Doran, supra*, 439 *U.S.* at 289, 99 *S.Ct.* at 535, 58 *L.Ed.*2d at 527). "A governor's grant of extradition is prima

facie evidence that the constitutional and statutory requirements have been met." *Doran, supra,* 439 *U.S.* at 289, 99 *S.Ct.* at 535, 58 *L.Ed.*2d at 527. Because defendant does not raise any objections based on the *Doran* factors, he fails to overcome the strong presumption that the warrant of extradition is valid.

## III

■ Next we address defendant's contention that his extradition is precluded by the Uniform Criminal Extradition Act (the Uniform Act), codified in New Jersey at *N.J.S.A.* 2A:160–6 to –35. Defendant calls our attention to *N.J.S.A.* 2A:160–10, which is based on section 2 of the Uniform Act. See 11 *U.L.A.* 61 (1936). Specifically he relies on the following ambiguously-worded proviso that was added to *N.J.S.A.* 2A:160–10 by *L.* 1940, *c.* 259:

> [I]f the executive authority of any other state or district requests the extradition of any person charged in that state with murder, and that person is imprisoned in a penal institution or jail of this state for a term less than imprisonment for life, the governor of this state may deliver him or her up to the executive authority of the demanding state or district *for the purpose of trial* in said state or district; provided, however, that prior to the removal of the person from this state, the executive authority of the demanding state or district shall have agreed that the person so delivered up is to be returned immediately to this state, at the cost of the demanding state or district, to serve the balance of his or her term of imprisonment in the event of his or her acquittal in the demanding state, or in the event of his or her conviction in such state of manslaughter or any degree of murder the punishment for which is less than death or imprisonment for life. [Emphasis added.]

Application of *N.J.S.A.* 2A:160–10 clearly is limited to extradition "for the purpose of trial," yet defendant reads the proviso to prohibit transfer of all prisoners who are serving life sentences in New Jersey, whether for trial or for punishment.

The text of the proviso mirrors the language of *N.J.S.A.* 2A:160–5. Its proper interpretation may be reached only by reading it in conjunction with that section, which provides in relevant part:

If any person charged with the crime of murder in this state is undergoing imprisonment in any other state, territory or district of the United States for a term less than imprisonment for life, and the governor of this state shall make demand for the return to this state of the person so charged, the governor may agree with the executive authority of such state, territory or district that, if the person so charged shall, on his trial in this state, be acquitted, or shall be convicted of the crime of manslaughter, or any degree of murder the punishment for which is less than death or imprisonment for life, such person shall be returned immediately to such other state, territory or district, at the expense of this state. The costs incident to the return of such person shall be borne by the county in which such person was tried for the crime of murder.

The manifest purpose of *N.J.S.A.* 2A:160–5, which was adopted in 1933, seven years before the proviso was added to *N.J.S.A.* 2A:160–10, is to permit the Governor of New Jersey to agree that this State will cover the cost of returning certain demanded prisoners to their asylum state if after trial they receive a New Jersey sentence less than death or life imprisonment. The proviso to section 10, in mirroring the language of section 5, merely intended to create a reciprocal burden on other states. Hence, nothing in *N.J.S.A.* 2A:160–10 prohibits the Governor from exercising his discretion to extradite a prisoner serving a life sentence in New Jersey to another state for that state to exact its punishment.

Although *N.J.S.A.* 2A:160–10 concerns only extradition for trial, the language of the proviso is indicative of how the Legislature would view this case concerning extradition for the purpose of punishment. The proviso states that the demanding state must return the prisoner to New Jersey "in the event of his or her acquittal in the demanding state, or in the event of his or her conviction in such state of manslaughter or any degree of murder the punishment for which is less than death or imprisonment for life." If the prisoner is convicted and sentenced to death or life imprisonment in the demanding state, however, that state is free to retain the prisoner and exact its own punishment. Thus, the Legislature has expressed no interest in exacting full punishment from a prisoner serving a life sentence in New Jersey when the prisoner will receive the same or an even harsher punishment in another state.

If any section of the Uniform Act is implicated in this case, it is section 19, codified at *N.J.S.A.* 2A:160-27. That section provides:

> If a criminal prosecution has been instituted against such person under the laws of this state and is still pending, the governor, in his discretion, either may surrender him on demand of the executive authority of another state or hold him until he has been tried and discharged or convicted and punished in this state.

As the dissent notes, "[t]hat provision permits the governor to extradite anyone prosecuted criminally by New Jersey when such prosecution 'is still pending.' " *Post* at 289, 590 *A.*2d at 1136. But courts construing section 19 have found it "broad enough to cover rendition of a prisoner then serving his sentence." *E.g., In re Ierardi*, 366 *Mass.* 640, 648, 321 *N.E.*2d 921, 926 (1975). Thus, although in the typical case section 19 allows the governor of the asylum state to extradite a prisoner to stand trial, see, *e.g., Commonwealth ex. rel. Houser v. Seip*, 385 *Pa.* 545, 124 *A.*2d 110, 115 (1956), that section also has been interpreted to permit extradition of a prisoner to allow the demanding state to exact its punishment. See, *e.g., Koch v. O'Brien*, 101 *N.H.* 11, 13, 131 *A.*2d 63, 64 (1957). The section reflects one of the guiding principles of the Uniform Act: the decision to extradite is a matter of comity between sister states. See *State v. White*, 131 *Ariz.* 228, 230, 639 *P.*2d 1053, 1055 (Ct.App.1981). Here, *N.J.S.A.* 2A:160-27 merely provides the Governor with the same option he had under general principles of extradition law: he could immediately extradite Robbins to California or he could delay extradition until Robbins has completed his sentence in New Jersey.

## IV

Finally we consider defendant's assertion that the Interstate Agreement on Detainers (the Agreement), codified at *N.J.S.A.* 2A:159A-1 to -15, precludes extradition under the circumstances of this case. Robbins argues that the Agreement provides the exclusive means for transferring a prisoner between jurisdictions, and that his transfer is precluded be-

cause it is not authorized by the Agreement. Because we conclude that the Agreement does not apply to this case, we reject defendant's contention.

The purpose of the Agreement "is to encourage the expeditious and orderly disposition of indictments, informations or complaints pending against defendants already incarcerated in other jurisdictions." *State v. Brockington*, 89 *N.J.Super.* 423, 428–29, 215 *A*.2d 362 (App.Div.1965). California does not seek rendition in this case to place Robbins on trial for outstanding criminal charges; rather, it wishes to carry out its already-pending sentence. As the court observed in *Johnson v. Williams*, 508 *F.Supp.* 52, 55 (D.N.J.1980), *aff'd*, 666 *F*.2d 842 (3d Cir.1981), "Detainers lodged to obtain custody for the purpose of serving a sentence are not within the scope of the Agreement at all." *See also State v. Evans*, 235 *N.J.Super.* 189, 193, 561 *A*.2d 1174 (App.Div.1989) (detainer that sought custody of defendant for completion of sentence rather than to face pending criminal charges "clearly does not come within the scope of the Agreement"). Defendant's argument that the Agreement provides the exclusive means of transferring prisoners is without merit.

## V

We hold that as a matter of comity, the decision to extradite a prisoner serving a New Jersey sentence to a demanding state to allow that state to exact its punishment before the prisoner completes his sentence here is within the discretion of the Governor of New Jersey. Nothing in the Uniform Act or the Agreement prohibits extradition under those circumstances.

The record is uninformative, however, on whether when the former Governor decided in favor of Robbins' extradition, the Governor and his counsel applied the same legal principles bearing on his decision as we do now, those principles not having been hitherto explicated in any opinion of this Court. More specifically, the record does not contain findings demon-

strating that the Governor was aware that the circumstances did not mandate extradition and left him free to exercise his discretion either to sign or refuse to sign the warrant. As noted above, *supra* at 290, 590 *A*.2d at 1137, the exercise of such executive power is presumptively correct and thereby in accord with correct legal principles. Of course, it remains open to the parties to request that the matter be reconsidered anew in light of the principles set forth in this opinion.

Judgment affirmed.

HANDLER, J., dissenting.

The defendant in this case is a New Jersey prisoner serving a life sentence. The Legislature has not authorized such a person to be extradited to a foreign jurisdiction to be prosecuted, let alone to be executed. Yet that is precisely what the Court orders. I dissent.

The Court now decides that defendant should be sent to California to be put to death. The legal principles gathered to condone this surrogate execution reflect neither sense nor justice in the circumstances. The key to the Court's thinking appears to be "comity." "[A]s a matter of comity," the Court believes, "the decision to extradite a prisoner serving a New Jersey sentence to a demanding state to allow that state to exact its punishment before the prisoner completes his sentence here is within the discretion of the Governor of New Jersey." *Ante* at 293, 590 *A*.2d at 1139. Disembodied from its context, that observation appears innocuous. Given context, it is lethal. The Court's observation purports to justify, only by the vaguest reference to comity, extraditing a prisoner who is serving a life term despite a specific statutory condition that requires that, in order to be extradited, a prisoner must be serving *less* than a life sentence. Comity, as used by the Court, implies a gubernatorial discretion that is basically unfettered. That discretion, however, is not absolute; it is constrained by statutory conditions. In the circumstances of this case, without a fully-in-

formed executive determination that manifestly conforms to express legislative standards, comity cannot be invoked to send a prisoner to his death.

I.

The critical question in this case is whether a person serving a life sentence in New Jersey may be delivered up to another state for execution. A provision of the Uniform Criminal Extradition Act (UCEA), enacted in New Jersey as *N.J.S.A.* 2A:160–10, governs this issue. It says that an asylum state must deliver to a demanding state

> any person charged in that state with treason, felony or other crime, who has fled from justice and is found in this state; provided if the executive authority of any other state or district requests the extradition of any person charged in that state with murder, and that person is imprisoned in a penal institution of this state *for a term less than imprisonment for life,* the governor of this state may deliver him or her up to the demanding state or district for the purpose of trial in said state or district; provided, however, that prior to removal of the person from this state, the executive authority of the demanding state or district shall have agreed that the person so delivered up is to be returned immediately to this state or district, to serve the balance of his or her term of imprisonment in the event of his or her acquittal in the demanding state, or in the event of his or her conviction in such a state of manslaughter or any degree of murder the punishment for which is less than death or imprisonment for life. [*N.J.S.A.* 2A:160–10 (emphasis added).]

A fair reading of the statute suggests that the transfer of an offender sentenced to a term of life is barred because persons serving life sentences in New Jersey are expressly excepted from the statute. At the very least, the status of "lifers" is simply not addressed by the legislation.

Other considerations support the conclusion that the Legislature has not authorized extradition in this situation. In the circumstances of this case—in which a prisoner is sought to be extradited to be executed for capital murder in another state— our extradition statute cannot be read without considering our own capital-murder statute and jurisprudence. See discussion *infra* at 300–302, 590 *A.*2d at 1142–1143. Our Legislature has made clear and explicit its policies respecting those potentially facing a death sentence. It has not left the execution of a

capital defendant to an unchannelled discretion. Further, this Court itself has acted scrupulously to conform to these policies. *See, e.g., State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987) (a defendant may not be sentenced to death in the absence of a unanimous verdict that aggravating factors outweigh mitigating factors beyond a reasonable doubt); *State v. Kiett,* 121 *N.J.* 483, 582 *A.*2d 630 (1990) (a juvenile may not be prosecuted for capital murder). It is both plausible and rational to believe that, in its articulation of state policy concerning capital murder, the Legislature would have made provision, had it so intended, for the extradition of convicted murderers for purposes of fulfilling the capital sentences imposed on such murderers by other states. Given the extraordinary penal consequences of extradition in these circumstances, the only permissible inference to be extracted from the language of the extradition statute, fortified by the absence of any reference to this subject in the capital-murder statute, is that such a transfer is barred. Whether the statute expressly prohibits the transfer or simply fails to address the situation, the Governor is deprived of any discretionary power to extradite defendant. *Cf. Watson v. Enslow,* 183 *Colo.* 435, 438, 517 *P.*2d 1346, 1348 (extradition statute "is both a grant and limitation of the executive authority"), *cert. denied,* 419 *U.S.* 880, 95 *S.Ct.* 145, 42 *L.Ed.*2d 120 (1974); *Carpenter v. Lord,* 88 *Or.* 128, 171 *P.* 577 (1918) (Oregon legislature enacted statute "limiting the authority of the executive" to extradite prisoners; statute is worded in "mandatory language, and completely removes any discretion which the executive might otherwise exercise in such a case"). *But see Buffalo v. Tanksley,* 189 *Colo.* 45, 536 *P.*2d 827 (1975) (limiting *Watson* to situations in which governor no longer has custody over defendant).

That the Legislature has chosen to deal with the subject of extradition cannot be overemphasized. Because comity, in effect, has been codified, extradition in the context of this case is a matter that must be considered as having been co-opted by the Legislature. Hence, general principles of comity in the

sense of unrestrained executive discretion are not applicable and cannot trump a contrary statute. Stated simply, under the extradition statute, the duty to extradite does not mature, and extradition cannot be compelled, until defendant finishes serving his New Jersey sentence. *Cf. Nelson v. George,* 399 *U.S.* 224, 229 n. 6, 90 *S.Ct.* 1963, 1966 n. 6, 26 *L.Ed.*2d 578, 583 n. 6 (1970) ("until the obligation to extradite matures, the Full Faith and Credit Clause does not require [an asylum state] to enforce the [demanding state's] penal judgment in any way"); *Taylor v. Taintor,* 83 *U.S.* 366, 371, 21 *L.Ed.* 287, 290 (1873) ("if the laws of the [asylum] State have been put in force against the fugitive, and he is imprisoned there, the demands of those laws may first be satisfied"). By contrast to the language of those cases, however, the statute here completely controls the Governor's discretion.

The Court's wayward interpretation of *N.J.S.A.* 2A:160–10 to authorize the foreign execution of a New Jersey prisoner not only fails on counts of common sense and basic justice, it ignores the public policy inherent in the legislative scheme. Sensibly read and construed, *N.J.S.A.* 2A:160–10 stands as a legislative pronouncement that the State itself will exact the maximum punishment from its worst offenders. The State, in effect, has reserved to itself the prerogative of obtaining the full measure of punishment of those offenders who are particularly blameworthy.

Several factors demonstrate that the statute embraces such a policy. According to the plain terms of the statute, a life-term prisoner is not eligible to be extradited. The statute as written thus means that a prisoner serving a life term would be required to remain in New Jersey to serve out his sentence. Significantly, a prisoner sentenced to death is not even mentioned in the statute. That is a purposeful omission. Obviously, the Legislature could not have been unaware or indifferent to the fact that persons in New Jersey could be subject to a death sentence. *N.J.S.A.* 2A:160–10 was enacted in 1933 and amended in 1940, a time during which the death penalty existed

in New Jersey. *See State v. Ramseur, supra,* 106 *N.J.* at 371–73, 524 *A.*2d 188 (Handler, J., dissenting) (reciting history of New Jersey death penalty). In addition, the statute specifically refers to persons who may be sentenced to death by a foreign state. Consequently, the omission from *N.J.S.A.* 2A:160–10 of persons under a New Jersey death sentence reflects the understanding that such persons presumably would be executed by New Jersey and would not be subject to extradition.

The retributive state policy of assuring that its maximum sentences—life or death—will be carried out can be contrasted instructively with the treatment accorded to prisoners not serving a maximum sentence of at least life imprisonment. The Legislature was satisfied that such prisoners should be eligible for extradition. Hence, with respect only to prisoners serving *lesser* sentences, a term of years less than life, has the Legislature chosen to give deference to a demanding state's interest in seeking its own punishments. However, *N.J.S.A.* 2A:160–10 itself requires the return to New Jersey of such a prisoner if that person receives *less* than a maximum sentence from the demanding state. Conversely, the statute authorizes the *non*-return of such a New Jersey prisoner who is given a sentence of life imprisonment or death by the demanding jurisdiction. In short, *N.J.S.A.* 2A:160–10, by its express exception for those serving life sentences and its purposeful omission of those under a death sentence, reflects a legislative determination that New Jersey has a direct interest in securing the full exaction of its own maximum sentences.

The Court here simply assumes our State's maximum sentence is not only the same as California's maximum sentence but that our interest in having *our* sentence served is no greater than our interest in allowing California to carry out its maximum sentence. The statutory scheme of *N.J.S.A.* 2A:160–10, however, indicates that the State has chosen *not* to defer to a similar or parallel retributive interest of a foreign jurisdiction when the prisoner is under a maximum sentence imposed by

this State. Even if such a jurisdiction seeks to prosecute an offender for crimes that could result in a sentence as harsh as our State's own maximum sentences of life imprisonment or death, the statute does not make such an offender eligible for extradition. Thus, when it comes to exacting the maximum sentence on an offender, New Jersey has chosen in effect to give priority to its own penal and retributive interests over those of another state.

The majority acknowledges that *N.J.S.A.* 2A:160–10, by its clear terms, does not authorize an extradition for the purposes of punishment. *Ante* at 290, 292, 590 *A.*2d at 1137, 1138. However, it insists that more must be read into *N.J.S.A.* 2A:160–10 and that "[i]ts proper interpretation may be reached only by reading it in conjunction with [*N.J.S.A.* 2A:160–5]." *Ante* at 290, 590 *A.*2d at 1137. The Court reads *N.J.S.A.* 2A:160–5 as "permit[ting] the Governor of New Jersey to agree that this State will cover the cost of returning certain demanded prisoners to their asylum state if after trial they receive a New Jersey sentence less than death or life imprisonment." *Ante* at 290, 590 *A.*2d at 1137. It explains that *N.J.S.A.* 2A:160–10 "merely intended to create a reciprocal burden on other states." *Ante* at 290, 590 *A.*2d at 1137. It fails to explain, however, why, if our Legislature "merely" sought to create such a reciprocal financial burden, *N.J.S.A.* 2A:160–10 excludes those serving life sentences from transfer. The answer is that the Legislature did not intend to let such prisoners go in the first place. Moreover, as noted, *N.J.S.A.* 2A:160–10 recognizes that a New Jersey prisoner who is extradited and receives a life sentence or a death sentence in the foreign jurisdiction need not be returned to serve his New Jersey sentence. Hence, *N.J.S.A.* 2A:160–5, which ensures the payment to return a prisoner and is invoked by the Court to amplify *N.J.S.A.* 2A:160–10, simply has no relevance or applicability in the circumstances of a prisoner who has received, and who will receive, a sentence of death or life imprisonment in both the asylum and demanding states, respectively.

Further, the majority unceremoniously brushes aside the specifically underinclusive language of *N.J.S.A.* 2A:160–10 and fastens on the more sweeping language of *N.J.S.A.* 2A:160–27. That provision permits the governor to extradite anyone prosecuted criminally by New Jersey when such prosecution "is still pending." The majority takes an expansive view of that language, finding it " 'broad enough to cover rendition of a prisoner then serving his sentence.' " *Ante* at 292, 590 *A.*2d at 1138 (quoting *In re Ierardi,* 366 *Mass.* 640, 647–49, 321 *N.E.*2d 921, 926 (1975)). However, "prosecution" generally contemplates proceedings designed to "determin[e] the guilt or innocence of a person charged with crime." *Black's Law Dictionary* (5th ed. 1979). This interpretation is supported by the language of *N.J.S.A.* 2A:160–27, which states that if a governor does not extradite a person while that person is being tried in the asylum state, the governor must "hold him *until he has been tried and discharged or convicted and punished in this state.*" (Emphasis added). That language suggests that prosecution ceases after discharge or conviction (barring appeal) and that someone convicted may be extradited only after being convicted *and* punished in New Jersey. It is uncontested that defendant had been found guilty of murder in New Jersey. Indeed, our own capital-murder statute contemplates that a conviction for murder, even though on appeal, constitutes a final murder conviction that can be considered as an aggravating factor, *N.J.S.A.* 2C:11–3c(4)(a), in a subsequent capital-murder prosecution. *L.*1985, *c.* 178 § 2; *N.J.S.A.* 2C:11–3c(4)(a); *cf. State v. Biegenwald,* 96 *N.J.* 630, 633, 477 *A.*2d 318 (1984) (holding, prior to the statutory amendment, that murder convictions on appeal were not final). *N.J.S.A.* 2A:160–27 manifestly does not include prisoners serving life sentences who are no longer being prosecuted by the State.

In effect, this Court is being asked, and has agreed, to send defendant to his death. Our Legislature has expressed its view on the death penalty, see *L.*1982, *c.* 111; *N.J.S.A.* 2C:11–3, and this Court has endeavored to serve the public policy underlying

that view. See, *e.g., State v. Marshall,* 123 *N.J.* 1, 586 *A.*2d 85 (1991). The very existence of a death-penalty statute, and amendments thereto, demonstrates that our Legislature has set out the class of murders for which it deems the death penalty appropriate. Capital punishment being a matter of critical importance, the Legislature has seen fit to amend the original statute to address problems and situations not addressed in the original enactment. See, *e.g., L.*1985, *c.* 178, eff. June 10, 1985 (admissibility of State's penalty-phase evidence governed by rules of evidence; evidence offered by defendant in mitigation not governed by rules of evidence, but State can rebut such evidence; aggravating factors must outweigh mitigating factors beyond reasonable doubt before death penalty can be imposed; jury shall be informed of the consequences of its verdicts); *L.*1985, *c.* 478, eff. Jan. 17, 1986 (making juveniles ineligible for the death penalty; making mandatory an appeal to the Supreme Court when the death penalty is imposed). In light of the policies articulated in the death-penalty statute, if the Legislature wishes to permit extradition of lifers for purposes of execution, one would reasonably infer that it will do so explicitly. New Jersey's participation is indispensable in carrying out defendant's execution, and we cannot shed all responsibility for defendant because he has been convicted and sentenced to death in a foreign jurisdiction.

We have repeatedly emphasized that "death is different"—it is final and irreversible. *See, e.g., State v. Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188; *State v. Williams,* 93 *N.J.* 39, 459 *A.*2d 641 (1983). Under our own statute, before allowing a death sentence to stand, we profess to review cases scrupulously to ensure that trials are conducted in accordance with our capital-murder statute and enhanced standards of fairness. *See, e.g., State v. Bey,* 112 *N.J.* 123, 548 *A.*2d 887 (1988). The prospect of execution requires that we ensure as best we can that one facing a final penalty has received the full measure of heightened protections guaranteed to him. To send this defendant away to be executed, in light of the gap in *N.J.S.A.*

2A:160–10 and the policies underlying our capital-murder statute, scoffs at those principles. We require heightened standards when a defendant faces death; we can hardly permit death by statutory inference.

## II.

In sum, this transfer is barred because the Legislature has said it is, or at least has not expressly or impliedly authorized it. Given our Legislature's pronouncements on the death penalty, which, notably, was enacted after the extradition statutes, we cannot be sure that the Legislature intended someone such as defendant to be sent to his death. No legislative history exists to amplify the language of *N.J.S.A.* 2A:160–10. The slate is blank. The Court nevertheless superimposes its own notion of the Legislature's intent. Unlike the majority, I would not assume that the Legislature's insulation of those serving life sentences in New Jersey is the freakish consequence of imprecise drafting. Almost all those serving life sentences in New Jersey, like defendant, were convicted of first-degree murder and perhaps other offenses as well. *N.J.S.A.* 2A:160–10 and the death-penalty statute indicate that the Legislature has a strong retributive interest in securing its own legal punishment from those who commit crimes punishable by New Jersey's harshest penalties. The Legislature has taken great pains to establish a structure by which such defendants may be tried and sentenced, and maintains a strong interest in seeing its policies in this area carried out. The Governor cannot circumvent the public policy of the State. In concluding otherwise, the Court twists the concept of comity beyond its proper purpose.

For the foregoing reasons, I would hold that the Governor exceeded his authority by signing the warrant of extradition, and that the Law Division committed error by not quashing the warrant.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Dissenting*—Justice HANDLER—1.