17 A.3d 256 (2011)
419 N.J. Super. 413
STATE of New Jersey, Plaintiff-Respondent,
v.
HAI KIM NGUYEN, Defendant-Appellant.
No. A-2311-09T2
Superior Court of New Jersey, Appellate Division.
Argued February 8, 2011.
Decided April 15, 2011.
*257 Paul Casteleiro, Hoboken, argued the cause for appellant.
Frank J. Ducoat, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Mr. Ducoat, of counsel and on the brief).
Before Judges PARRILLO, YANNOTTI and SKILLMAN.
The opinion of the court was delivered by
*258 SKILLMAN, J.A.D. (retired and temporarily assigned on recall).
Defendant committed a murder in New Jersey and then fled to New York, where he was apprehended and evidence of the crime was recovered. This appeal presents two issues arising out of defendant's flight to New York after the murder. First, defendant argues that the trial court should have dismissed the indictment because the State did not bring him to trial within 120 days after his arrival in New Jersey, as required by the Interstate Agreement on Detainers (IAD). We reject this argument because the record indicates that New York transferred custody of defendant under the Extradition Clause of the United States Constitution and the Uniform Criminal Extradition Act, and therefore, the speedy trial provision of the IAD did not apply to defendant's trial. Second, defendant argues that the trial court erred in denying his motion to suppress evidence of a handgun later identified as the murder weapon, because it was discovered in the course of a search by Somerset County Prosecutor's Office investigators who were not authorized under the governing New York statute to conduct a search in New York. We reject this argument because the violation of the New York statute by the New Jersey investigators who discovered the murder weapon was a technical violation that did not implicate privacy rights protected by the Fourth Amendment or its New Jersey counterpart, and therefore, the remedy of exclusion of evidence was not required.

I.
Defendant's convictions were based on a killing that occurred on the front lawn of the Dynasty Restaurant in Green Brook on March 24, 2002. Defendant and the victim, Tuan Thieu, were both guests at a wedding reception in the restaurant. The two men had an argument arising out of a previous dispute about a woman, which escalated into a physical altercation. Defendant then pulled out a gun and shot Thieu eight times. Defendant also shot at a bystander, but missed. After killing Thieu, defendant fled the scene in a 1996 Honda Accord.
The police arrived at the restaurant shortly after the shooting. Witnesses to the crime identified defendant as the shooter and provided the police with an address in Brooklyn, 1062 Lafayette Avenue, where he had been living. The witnesses also told the police that defendant had driven away in a 1996 Honda with Alabama license plates, which they had seen him drive on other occasions.
The day after the murder, Somerset County Prosecutor's Office detectives went to arrest defendant at the 1062 Lafayette Avenue address, accompanied by officers of the New York City Police Department. However, when the officers knocked on the door, defendant refused to come out, and thereafter, a female told the police defendant was inside the apartment with her two-year-old son. A hostage negotiation team of New York City police was dispatched to the scene, and after about four hours, defendant agreed to end the standoff and was immediately arrested.
After defendant's arrest, the police secured the 1062 Lafayette Avenue residence and the 19% Honda Accord defendant had driven from the murder scene in order to apply for search warrants. Shortly thereafter, the police applied for and obtained warrants to search both the residence and the car.
The search of the residence revealed various articles of clothing defendant may have been wearing at the time of the crime and a shoebox containing gun cleaning *259 equipment. However, this search did not result in discovery of the murder weapon.
The police searched the car in the parking lot at the headquarters of the New York City police officers who participated in the investigation. This search revealed marijuana secreted in the roof of the car, which was turned over to the New York City officers, but not the murder weapon.
Arrangements were then made to return the car to Kenneth Eng, a resident of 1062 Lafayette Avenue and friend of defendant to whom the owner of the car had entrusted possession. Detective Rinaldi of the Somerset County Prosecutor's Office began driving the car from police headquarters back to 1062 Lafayette Avenue. As he was driving, Detective Rinaldi heard a rattling sound above his head every time he made a turn. When he arrived at 1062 Lafayette Avenue, he and Timothy Braun, another member of the Somerset County Prosecutor's Office who had been following him, searched the area of the car's roof where Detective Rinaldi had heard the rattling sound. This search revealed a handgun, which forensic testing showed to be the murder weapon. The Somerset County detectives brought the handgun and the items seized in the search of 1062 Lafayette Avenue back to New Jersey.
On April 24, 2002, defendant was indicted for murder and various other offenses. On August 20, 2003, the Governors of New York and New Jersey entered into an agreement for defendant's extradition from New York to New Jersey. On November 17, 2003, defendant was brought from New York to New Jersey.
Defendant remained in pretrial incarceration in New Jersey from 2003 until his guilty plea and sentence in 2009, during which time he filed numerous motions directed at the charges against him. One motion was to dismiss the indictment on the ground that defendant's lengthy pre-trial incarceration in New Jersey violated the IAD. Another was to suppress evidence of the handgun on the ground that the Somerset County detectives violated New York statutory law and the terms of the warrant in their search of the car. The trial court denied both motions.
Following denial of these motions, defendant pled guilty pursuant to a plea bargain to aggravated manslaughter, in violation of N.J.S.A. 2C:11-4(a)(1), and attempted murder, in violation of N.J.S.A 2C:5-1 and N.J.S.A. 2C:11-3(a)(1) or (2). Under the plea bargain, the State agreed to dismiss a charge of purposeful or knowing murder, in violation of N.J.S.A. 2C:11-3(a)(1) or (2), and to recommend an aggregate sentence of not more than twenty years imprisonment. In addition, defendant preserved the right to appeal the denial of his pretrial motions to dismiss the indictment based on the State's alleged failure to bring the charges against him to trial within the 120-day period required by the IAD and to suppress evidence of the handgun. The trial court sentenced defendant in accordance with the plea bargain to concurrent twenty-year terms of imprisonment for aggravated manslaughter and attempted murder, subject to the seventeen-year period of parole ineligibility mandated by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, which are to be served concurrently with New York sentences defendant was already serving.

II.
Defendant argues that the trial court erred in denying his motion to dismiss the indictment because he was not brought to trial within the 120-day period after his arrival in New Jersey required under the IAD, see N.J.S.A. 2A:159A-4(c), in which both New Jersey and New York *260 have joined. N.J.S.A. 2A:159A-1 to -15; N.Y.Crim. Proc. Law § 580.20. However, as the State argues, there is no evidence that custody of defendant was transferred from New York to New Jersey pursuant to the IAD. Instead, the record indicates defendant was transferred to New Jersey in accordance with the Uniform Criminal Extradition Act (UCEA), N.J.S.A. 2A:160-6 to -35, which does not contain any provision requiring a defendant to be brought to trial within a specified period of time.[1] Therefore, defendant is not entitled to relief under the IAD.
A state's right to extradite an accused who has fled to another state is protected by the Extradition Clause of the United States Constitution, which provides:
A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.
[U.S. Const, art. IV, § 2, cl. 2.]
In 1793, Congress enacted the Federal Rendition Act, 18 U.S.C.A. §§ 3181-96, which has remained substantially unchanged since its enactment, Puerto Rico v. Branstad, 483 U.S. 219, 223 n. 2, 107 S.Ct. 2802, 2805, 97 L.Ed.2d 187, 192 (1987), to implement the Extradition Clause. However, this Act does not contain detailed procedures governing extraditions. Consequently, in 1936 the National Conference of Commissioners on Uniform State Laws proposed a Uniform Criminal Extradition Act (UCEA) containing such procedures, 11 U.L.A. 289-660 (2003), which was subsequently enacted by most states, including New Jersey and New York, N.J.S.A. 2A:160-6 to -35; N.Y.Crim. Proc. Law §§ 570.02 to .66. New Jersey's version of the Uniform Act was enacted in 1936, L. 1936, c. 42, and has continued in its original form since then. We have held that the UCEA is "in proper furtherance of, and in nowise inconsistent with" the Extradition Clause and the Federal Rendition Act. Stark v. Livermore, 3 N.J.Super. 94, 99, 65 A.2d 625 (App.Div.), certif. denied, 3 N.J. 365, 70 A.2d 534 (1949); accord People ex rel. Matochik v. Baker, 306 N.Y. 32, 114 N.E.2d 194, 195 (1953).
Under the UCEA, the governor of the sending state may agree to extradite a prisoner currently incarcerated in that state to face criminal charges in the receiving state. N.J.S.A. 2A:160-15. Before such an agreement may be entered into, the prosecutor in the receiving state must file a written application with the governor of that state demanding the return of the prisoner. N.J.S.A. 2A:160-32. This application must be supported by an affidavit describing the crime the prisoner allegedly committed and the prisoner's current location. Ibid. Thereafter, the receiving state's governor may make a demand to the sending state's governor for extradition. N.J.S.A. 2A:160-11. The sending state's governor "may [then] waive the right of that state to retain the prisoner and may surrender him to the demanding state ... while he is still undergoing, or subject to, punishment in the [sending] state." State v. Robbins, 124 N.J. 282, 288, 590 A.2d 1133 (1991) (quoting 35 C.J.S. Extradition § 11, at 398-99 (I960)).
The IAD, an interstate compact in which both New Jersey and New York *261 joined after enactment of the UCEA,[2] provides an alternative procedure by which a state may obtain custody of a person accused of a crime who is in the custody of another state. In 1956, the Council of State Governments drafted the IAD, which has now been entered into by forty-eight states, the Federal Government, and the District of Columbia. Alabama v. Bozeman, 533 U.S. 146, 149, 121 S.Ct. 2079, 2083, 150 L.Ed.2d 188, 193 (2001). The essential objective of the IAD is to "create[ ] uniform procedures for lodging and executing a detainer, i.e., a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime." Id. at 148, 121 S.Ct. at 2082, 150 L.Ed.2d at 192; see also New York v. Hill, 528 U.S. 110, 111-12, 120 S.Ct. 659, 662, 145 L.Ed.2d 560, 564-65 (2000).
"The IAD's reach, however, does not extend beyond its specific terms." State v. Baker, 198 N.J. 189, 192, 966 A.2d 488 (2009). "Thus, when a statethe receiving stateseeks to prosecute a person in the custody of another statethe sending statethe receiving state triggers the IAD by the coalescence of two separate but distinct acts: the lodging of a detainer with the sending state and the `presentation of a written request for temporary custody or availability' to the sending state. N.J.S.A. 2A:159A-4(a)." Ibid. "The absence of either element renders the IAD inapplicable." Id. at 194, 966 A.2d 488.
The record indicates that defendant was transferred from the custody of New York to New Jersey under the procedures set forth in the UCEA rather than the IAD. On May 9, 2002, the Somerset County Prosecutor's Office submitted a request, supported by the required affidavit, to Governor McGreevey of New Jersey to issue a requisition upon Governor Pataki of New York to extradite defendant to New Jersey for prosecution of the murder and other charges pending in this State. On May 14, 2002, Governor McGreevey submitted a request to Governor Pataki for defendant's extradition and signed the proposed extradition agreement the same day. On August 20, 2003, Governor Pataki also signed the agreement. Thus, as of that date, all the paperwork required for defendant's extradition pursuant to the UCEA had been completed.
On the other hand, there is no indication New Jersey followed any of the procedures of the IAD to secure custody of defendant. There is no evidence New Jersey ever lodged a detainer against defendant with the New York prison where he was incarcerated or that New Jersey ever made a written request to New York, "approved, recorded and transmitted" by the New Jersey trial court, N.J.S.A 2A:159A-4(a), for temporary custody of defendant. See Baker, supra, 198 N.J. at 194, 966 A.2d 488.
Although the only document in the record providing for the transfer of custody of defendant from New York to New Jersey is the extradition agreement between the Governors of New York and New Jersey, defendant argues that such an agreement "does not render IAD inapplicable to the transfer of an individual with pending charges in the receiving state and thereby divest the defendant of the rights conferred on a transferred prisoner under IAD to be tried within a certain period of time."
*262 This argument is similar to the argument rejected by the Supreme Court of the United States in United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), which involved a writ of habeas corpus ad prosequendum issued by a federal district court to secure the presence for trial of a prisoner in the custody of a state. Id. at 358, 98 S.Ct. at 1846, 56 L.Ed.2d at 345. In rejecting the defendant's argument that such a writ is a "detainer" that triggers operation of the IAD, the Court stated:
The role and functioning of the ad prosequendum writ are rooted in history, and they bear little resemblance to the typical detainer which activates the provisions of the [IAD].
Unlike a writ of habeas corpus ad prosequendum issued by a federal district court, a detainer may be lodged against a prisoner on the initiative of a prosecutor or law enforcement officer. Rather than requiring the immediate presence of the prisoner, a detainer merely puts the officials of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison. Further action must be taken by the receiving State in order to obtain the prisoner.
. . . .
[T]he issuance of ad prosequendum writs by federal courts has a long history, dating back to the first Judiciary Act. We can therefore assume that Congress was well aware of the use of such writs by the Federal Government to obtain state prisoners and that when it used the word "detainer," it meant something quite different from a writ of habeas corpus ad prosequendum.

[Id. at 358, 360, 98 S.Ct. at 1846-47, 56 L.Ed.2d at 345-47.][3]
Based partly on Mauro, our Supreme Court in Baker rejected an argument, also similar to defendant's argument in this case, that "the repeated use of orders to produce or writs of habeas corpus ad prosequendum, subverts the purposes of the IAD and must, in the aggregate, trigger the provisions of the IAD." 198 N.J. at 193, 966 A.2d 488. The Court described the IAD as "a non-exclusive . . . framework by which prisoners held in custody by a sending state can be transferred to the custody of a receiving state for purposes of prosecution in the receiving state." Ibid. Consequently, the Court concluded that a transfer to New Jersey by means of a writ of habeas corpus ad prosequendum or order to produce does not constitute a "detainer" that triggers application of the IAD. Id. at 192-94, 966 A.2d *263 488; see also Robbins, supra, 124 N.J. at 293, 590 A.2d 1133.
Courts in other states have also held that the transfer of a defendant from one jurisdiction to another under legal authority other than the IAD, such as extradition under the Extradition Clause of the Constitution and the UCEA, provides an alternative framework by which a state may secure custody of a prisoner confined in another state without being required to comply with the procedures of the IAD. See, e.g., Gondolfi v. dinger, 352 Ark. 156, 98 S.W.3d 812, 817-18 (2003); People v. Quackenbush, 687 P.2d 448, 450-51 (Col. 1984); Commonwealth v. Wilson, 399 Mass. 455, 504 N.E.2d 1060, 1061-65 (1987); State v. Davis, 210 S.W.3d 229, 233-37 (Mo.Ct.App.2006), cert, denied, 551 U.S. 1152, 127 S.Ct. 3018, 168 L.Ed.2d 739 (2007); State v. Hall, 976 S.W.2d 121, 171-72 (Tenn.1998), cert, denied, 526 U.S. 1089, 119 S.Ct. 1501, 143 L.Ed.2d 654 (1999); Ex Parte King, supra, 286 S.W.3d at 601-04; State v. Roberson, 78 Wash.App. 600, 897 P.2d 443, 445, review denied 128 Wash.2d 1005, 907 P.2d 298 (1995). In Davis, the court observed:
The IAD is not the exclusive means of securing custody of an out-of-state prisoner for disposition of the charges pending against him in this State.... "[A] state retains its constitutional and statutory rights to extradite a fugitive from another state" and, accordingly, may choose to acquire custody of a defendant incarcerated in another state either through formal extradition or through the IAD.
[210 S.W.3d at 236 (quoting Hall, supra, 976 S.W.2d at 172).]
We note that even though there is no evidence that New Jersey followed any of the procedures of the IAD to secure custody of defendant, the parties and trial court assumed when defendant moved to dismiss the indictment on the ground he had not been brought to trial within 120 days, as required by N.J.S.A. 2A:1594(c), that New Jersey had obtained custody of defendant pursuant to the IAD. However, this misconception of the legal process by which custody of defendant was transferred to New Jersey "does not alter the essential nature of [defendant's] rendition [to New Jersey] as an extradition proceeding." Quackenbush, supra, 687 P.2d at 450. Therefore, we conclude that since custody of defendant was transferred to New Jersey under the Extradition Clause of the Constitution and the UCEA, he was not entitled to a dismissal of the indictment based on the State's alleged failure to bring him to trial within the time that would be required under the IAD.

III.
We turn next to defendant's argument that the trial court erred in denying his motion to suppress evidence of the handgun, later identified as the murder weapon, found in the roof of the 1996 Honda Accord he drove away from the scene of the murder. Defendant does not dispute that the police had probable cause to search the Honda nor does he question the validity of the warrant to conduct the search. However, he argues that the search violated a section of the New York Criminal Procedure Law and the terms of the warrant pursuant to which the search was conducted, and therefore, the trial court erred in denying his motion to suppress evidence of the handgun.
Before addressing this argument, we first consider defendant's suggestion that the police had completed the search of the car authorized by the warrant before they began to drive it back to 1062 Lafayette Avenue, and therefore, the further search conducted at that location was a warrantless search that was not justified *264 by exigent circumstances. The question whether a search warrant provides continuing authorization to search a place that the police have already searched is governed by the "reasonable continuation" doctrine. State v. Finesmith, 406 N.J.Super. 510, 519, 968 A.2d 715 (App.Div.2009). Under this doctrine, two conditions must be satisfied for a search to be considered a "reasonable continuation" of the search authorized by the warrant: "first, `the subsequent entry must . . . be a continuation of the original search, rather than a new and separate search,' and second, `the decision to conduct a second entry to continue the search must be reasonable under the totality of the circumstances.'" Ibid, (quoting United States v. Keszthelyi, 308 F.3d 557, 569 (6th Cir.2002)). The continued search of the roof of the Honda at 1062 Lafayette Avenue satisfied both of these conditions. This search occurred within a short time after the original search in the parking lot at police headquarters. At that point, the murder weapon, which was the primary object of the warrant, had not yet been found. Consequently, the search was simply "a continuation of the original search, rather than a new and separate search." Ibid. Moreover, the search did not involve any additional intrusion into defendant's or Eng's privacy interests because the car had not yet been returned to Eng. Therefore, this further search was "reasonable under the totality of the circumstances." Ibid.
Defendant's argument that the continuation of the search of the Honda at 1062 Lafayette Avenue violated New York law is based upon section 690.25 of the New York Criminal Procedure Law, which provides in pertinent part:
A search warrant must be addressed to a police officer whose geographical area of employment embraces or is embraced or partially embraced by the county of issuance. The warrant need not be addressed to a specific police officer but may be addressed to any police officer of a designated classification, or to any police officer of any classification employed or having general jurisdiction to act as a police officer in the county.
Defendant also relies upon the terms of the warrant authorizing the search to be conducted by "any police officer of the City of New York." Defendant argues that the search of the car that revealed the handgun used in the murder violated section 690.25 and the terms of the warrant because it was conducted solely by Detectives Rinaldi and Braun of the Somerset County Prosecutor's Office and not by any police officer of the City of New York.
Generally, the exclusionary rule applies only to evidence obtained in violation of the Fourth Amendment to the United States Constitution or Article I, Paragraph 7 of the New Jersey Constitution. See State v. Evers, 175 N.J. 355, 378-80, 815 A.2d 432 (2003); State v. Broom-Smith, 406 N.J.Super. 228, 238-39, 967 A.2d 359 (App.Div.2009), aff'd, 201 N.J. 229, 989 A.2d 840 (2010); State v. Gioe, 401 N.J.Super. 331, 341-14, 950 A.2d 930 (App.Div.2008), certif. denied, 199 N.J. 129, 970 A.2d 1046 (2009); State v. Gadsden, 303 N.J.Super. 491, 503-04, 697 A.2d 187 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997); State v. Riley, 216 N.J.Super. 383, 392, 523 A.2d 1089 (App. Div.1987). The exclusion of evidence obtained in violation of a statute is justifiable only if the violation affects privacy rights that the Fourth Amendment and its New Jersey counterpart were designed to protect. See Gioe, supra, 401 N.J.Super. at 341-44, 950 A.2d 930. As explained by the leading commentator in the field of search and seizure law:

*265 [T]he need for the remedy of exclusion [for a violation of a statute] can best be determined by taking into account the significance of the right involved and the degree of infringement. And in assessing the significance of the right, it is certainly appropriate to consider the relationship between the requirement of the relevant ... statute and the protections of the Fourth Amendment.
[1 Wayne R. LaFave, Search and Seizure § 1.5(b), at 163 (4th ed.2004).]
One example given by Professor LaFave of a statute that does not implicate the privacy protections of the Fourth Amendment is a statute providing that "the warrant must be executed by an officer who is within his territorial jurisdiction." Id. at 164-65. Therefore, a violation of such a statute does not require the exclusion of evidence.
Consistent with this view, our courts have held that evidence obtained by a police officer in a search conducted outside the boundaries of the officer's statutory jurisdiction is not subject to exclusion. In Gadsden, a group of Hillside police officers executed a warrant in Newark for the arrest of two persons suspected of committing armed robberies in Hillside. 303 N.J.Super. at 492, 697 A.2d 187. The arrests violated N.J.S.A. 40A:14-152, which limits police jurisdiction to the boundaries of an officer's own jurisdiction. Id. at 497, 697 A.2d 187. In rejecting a motion to suppress incriminating evidence obtained by the Hillside police officers after those arrests, we stated that the violation of N.J.S.A. 40A:14-152 "was of a procedural or technical nature," and did not violate any of the defendant's constitutional rights. Id. at 503, 697 A.2d 187; accord State v. White, 305 N.J.Super. 322, 332, 702 A.2d 514 (App.Div.1997); see also Virginia v. Moore, 553 U.S. 164, 174, 128 S.Ct. 1598, 1606, 170 L.Ed.2d 559, 569 (2008) (holding that a violation of a state statute that imposes restrictions upon a police officer's power to arrest that exceed what is required by the Fourth Amendment does not require suppression).
The conclusion that a technical violation of a statute governing the execution of search warrants, such as a statute governing a police officer's territorial jurisdiction, does not provide a basis for the exclusion of evidence is also supported by our rules of court. Rule 3:5-7(g) provides:
In the absence of bad faith, no search or seizure made with a search warrant shall be deemed unlawful because of technical insufficiencies or irregularities in the warrant . . . or in its execution. [Emphasis added.]
There is no basis for concluding that the continued search of the 1996 Honda at 1062 Lafayette Avenue by Detectives Rinaldi and Braun, without participation by New York City police officers, was conducted in "bad faith."
Although we have not located any New York case that declined to apply the exclusionary rule to evidence obtained as a result of a search or arrest beyond the boundaries of a police officer's statutory jurisdiction, New York courts have held in other contexts that violations of statutes that do not affect substantial rights are not grounds for suppression of evidence. See, e.g., People v. Dominique, 229 A.D.2A 719, 645 N.Y.S.2d 625, 626 (App.Div.1996), aff'd, 90 N.Y.2d 880, 661 N.Y.S.2d 597, 684 N.E.2d 27 (1997); People v. Camarre, 171 A.D.2d 1003, 569 N.Y.S.2d 224, 226 (App. Div.), appeal denied, 78 N.Y.2d 963, 574 N.Y.S.2d 942, 580 N.E.2d 414 (1991); People v. Davis, 93 A.D.2d 970, 463 N.Y.S.2d 67, 69 (App.Div.1983); see also People v. Walls, 35 N.Y.2d 419, 363 N.Y.S.2d 82, 321 N.E.2d 875, 876 (1974), cert, denied, 421 U.S. 951, 95 S.Ct. 1686, 44 L.Ed.2d 106 (1975). Therefore, if defendant had been *266 prosecuted for a violation of the New York statutes relating to unregistered firearms, it is unlikely a New York court would have suppressed evidence of the handgun that Detectives Rinaldi and Braun discovered in the roof of the Honda based on the violation of section 690.25 of the New York Criminal Procedure Law.
In any event, our courts are not bound, in a prosecution in New Jersey, by the remedy a court of another jurisdiction would apply for a violation of a statute governing search warrants in that state. See Evers, supra, 175 N.J. at 376-80, 815 A.2d 432.
Finally, we emphasize that any violation of section 690.25 of the New York Criminal Procedure Law was technical only. The representatives of the Somerset County Prosecutor's Office obtained the assistance of New York City police officers in applying for warrants to search the house where defendant was residing and the car he drove away from the murder scene. A Somerset County detective supplied most of the information contained in the affidavit in support of the warrants and appeared with New York police officers when the application was made. Furthermore, Somerset County detectives conducted the search of the house and the initial search of the car at police headquarters jointly with members of the New York City Police Department. Defendant does not dispute that these searches conformed with section 690.25. It is only the happenstance that the murder weapon was not found in the initial search of the car but was revealed only while Detective Rinaldi was driving it back to 1062 Lafayette Avenue that raises any issue of compliance with 690.25. Indeed, defendant does not appear to dispute that the search that revealed the handgun would have been valid if, after hearing the rattle above his head, Detective Rinaldi had returned to police headquarters and resumed the search jointly with New York City police officers. We conclude that the decision by Detectives Rinaldi and Braun to instead conduct a more intensive search of the roof of the car by themselves constituted at most a technical violation of section 690.25 that did not impermissibly intrude upon the privacy rights of defendant or Eng and therefore did not require suppression of evidence of the handgun.

IV.
Defendant also argues that he was entitled to jail credits for the entire time he was incarcerated in New Jersey awaiting trial even though he received credit for that period of incarceration on the New York sentences he was already serving. This argument is clearly without merit. R. 2:11-3(e)(2); see State v. Carreker, 172 N.J. 100, 115, 796 A.2d 847 (2002); State v. Black, 153 N.J. 438, 455-57, 710 A.2d 428 (1998).
Affirmed.
NOTES
[1] Such a defendant may, of course, invoke the speedy trial protections of the federal and state constitutions. See U.S. Const, amend. VI; N.J. Const, art. I, par. 10. Defendant has not asserted a violation of his constitutional right to a speedy trial.
[2] New Jersey joined the compact in 1958, L. 1958, c. 12, and New York in 1971, N.Y. Laws, ch. 524.
[3] The Court in Mauro also held that if the federal government lodges a detainer against a defendant, and then obtains a writ of habeas corpus ad prosequendum, it is subject to the IAD, including the 120-day speedy trial provision, upon securing custody of the prisoner. Id. at 362-65, 98 S.Ct. at 1848-49, 56 L.Ed.2d at 348-50. However, this holding has no applicability to the present case because there is no evidence that New Jersey authorities ever filed a detainer against defendant. Moreover, it is doubtful whether this holding would extend to an extradition pursuant to the UCEA. As the Texas Court of Appeals has pointed out:

By the express terms of article IV(a) [of the IAD], the request for temporary custody must be "approved, recorded, and transmitted" by the court having jurisdiction of the pending indictment, information or complaint. The eourt-issued writ of habeas corpus ad prosequendum [involved in Mauro] meets that express requirement. The governor's demand for appellant's rendition and arrest pursuant to the UCEA does not. [Ex Parte King, 286 S.W.3d 599, 604 (Tex. App.2009).]