**Jimmy Ray PITSONBARGER,**
**Petitioner–Appellant,**

v.

**Richard GRAMLEY, Respondent–**
**Appellee.**

No. 95–3912.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 5, 1996.

Decided Dec. 19, 1996.

Order Denying Rehearing Feb. 20, 1997.

Stephen E. Eberhardt (argued), Marshall J. Hartman, Capital Resource Center, Chicago, IL, Robert H. Farley, Jr., Naperville, IL, for Petitioner-Appellant.

Martha E. Gillis, Steven R. Splitt (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent-Appellee.

Before CUMMINGS, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

From August 26, 1987, to September 1, 1987, Jimmy Ray Pitsonbarger rampaged through the states of Nevada, Illinois, and Missouri, committing a series of crimes including sexual assault, attempted murder, armed robbery, and murder. The Nevada authorities were the first to prosecute. Pitsonbarger pleaded guilty in Nevada to charges of sexual assault, attempted murder, armed robbery, and several lesser offenses, for which he was given four life sentences without possibility of parole. Some time after he began serving his Nevada sentence, he was transferred at his own request to Illinois for disposition of the charges immediately before us, concerning the murders of Claude and Alta Brown. After a bench trial in the Circuit Court of Peoria County, he was convicted of two counts of murder and two counts of felony murder, and a jury sentenced him to death. Last, he was sent to Missouri, where he pleaded guilty to murder there in exchange for not being subject to a second sentence of death.

The interrelationship among these three proceedings provides the basis for one of Pitsonbarger's principal arguments in his federal habeas petition: that the Interstate Agreement on Detainers requires Illinois to return him to Nevada to "finish" serving his four life sentences there before Illinois may lawfully carry out its own sentence of death. In addition, Pitsonbarger claims that his trial counsel was ineffective for failing to inform the court that he was taking the psychotropic drug Librium at the time of trial and sentencing, as well as in several other respects, and he raises a number of points relating to his trial and appeal in the Illinois courts. We agree with the district court that several of these claims are procedurally barred, and that the remainder are without merit under the standards now governing the issuance of writs of habeas corpus. See the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254); *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996).

## I.

The Illinois Supreme Court affirmed both the judgment of conviction and the death sentence on direct appeal in *People v. Pitsonbarger,* 142 Ill.2d 353, 154 Ill.Dec. 562, 568 N.E.2d 783 (1990), *cert. denied,* 502 U.S. 871, 112 S.Ct. 204, 116 L.Ed.2d 163 (1991). Pitsonbarger then filed a petition for post-conviction relief in the Circuit Court for the Tenth Judicial Circuit of Illinois, Peoria County, on April 3, 1992, which promptly dismissed the petition as "frivolous and patently without merit." Pitsonbarger attempted to appeal that ruling to the Illinois Supreme Court, but the court dismissed the appeal for want of prosecution due to his failure to file a brief. (Pitsonbarger had filed a motion to extend the time for filing his brief, but his motion was denied, and the court rejected his tender of the brief after the deadline had passed.) Last came the present petition for federal habeas corpus relief under 28 U.S.C. § 2254, which he filed with the district court on March 16, 1995. The habeas petition raised thirty-five claims of error, which the court grouped into eleven headings, along with a twelfth discussing a number of claims that were procedurally de-

faulted. Pitsonbarger's appeal to this Court includes the same eleven claims.

In considering these claims, we bear in mind that the writ may issue with respect to issues decided on the merits in the state courts only if the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). Using these standards, our review of the legal determinations of the state courts continues to be *de novo.* In a sense, our review of mixed questions of law and fact is also *de novo,* see *Ornelas v. United States,* [—— U.S. ——, ——–——] 116 S.Ct. 1657, 1661–62 [134 L.Ed.2d 911] (1996) and *Thompson v. Keohane,* [—— U.S. ——, ——–——] 116 S.Ct. 457, 464–65 [133 L.Ed.2d 383] (1995), but the question we must answer is the more subtle one of whether the state court "unreasonably" applied clearly established federal law as the Supreme Court has determined it. As was the case prior to the AEDPA, factual determinations made by the state courts are presumed to be correct; this presumption may now be rebutted only by clear and convincing evidence. *Id.* § 2254(e)(1).

## II.

*A. Effectiveness of Assistance of Counsel*

At oral argument before this Court, Pitsonbarger's attorney gave greatest emphasis to his claim that Pitsonbarger had been deprived of the effective assistance of trial counsel—a claim he has been stymied from presenting effectively before the state courts because of additional procedural mix-ups that have plagued him throughout his journey through the judicial process. This claim, among others, is presently pending before the Circuit Court of Peoria County in a second petition for post-conviction relief filed under 725 ILCS 5/122–1. This Court initially stayed its consideration of Pitsonbarger's appeal when, at oral argument, his attorney renewed a motion for a stay pending resolu-

tion of the state court proceeding and the state did not object. Later, however, the state voiced its objection to a federal stay and both parties informed the court that as of November 4, 1996, no relevant developments had occurred in the state court nor were foreseeable in the immediate future. We accordingly lifted our stay and have now proceeded to dispose of the merits of Pitsonbarger's § 2254 appeal. Nothing in this opinion should be construed to limit in any way the relief that the Circuit Court of Peoria County may deem appropriate as a matter of state law or to constitute findings of fact that could restrict the state court's actions. We note, in that connection, that Illinois law appears to be evolving in the area of required hearings on incompetence to stand trial, when the claim is based on a defendant's use of psychotropic drugs at or near the time of trial or sentencing. See *People v. Brandon*, 162 Ill.2d 450, 205 Ill.Dec. 421, 643 N.E.2d 712 (1994); *People v. Nitz*, 173 Ill.2d 151, 218 Ill.Dec. 950, 670 N.E.2d 672 (1996); *People v. Birdsall*, 172 Ill.2d 464, 219 Ill.Dec. 22, 670 N.E.2d 700 (1996); 725 ILCS 5/104-21(a). Notwithstanding those developments, the duty of this Court is to review Pitsonbarger's claims in light of the factual findings in the state court proceedings already on the record, the legal requirements of exhaustion and proper presentment, and the substantive legal conclusions that flow from the record.

■ Pitsonbarger alleges that his trial counsel was ineffective in ten different ways, but the key point he presses on appeal is counsel's failure to inform Dr. Mortimer Beck (the psychiatrist who examined him to see if he was mentally fit to stand trial) that Pitsonbarger had been taking Librium prior to his fitness examination, as well as during trial and sentencing. Librium is a psychotropic medication that serves as a sedative-tranquilizer, and is most commonly used to reduce anxiety and tension. Pitsonbarger alleges that the drug caused him to appear disengaged from his surroundings. He also appears to assert that trial counsel was ineffective for failing to call to the trial court's attention the fact that he was using Librium for his nerves during the trial itself, and the fact that after his conviction, but before sentencing, he attempted to commit suicide.

This was particularly prejudicial, he claims, in light of the fact that had he been found unfit to stand trial, and then afterwards found to be fit for trial provided that he received assistance from a medical expert or received some other accommodation, Illinois law would have precluded the death penalty. See 725 ILCS 5/104-22, 5/104-26(b).

After reviewing the record, the district court concluded that none of these claims was presented either in his direct appeal to the Illinois Supreme Court or in his petition for post-conviction relief to the Circuit Court of Peoria County (including the appeals from the denial of state post-conviction relief). These omissions meant that the affected claims were procedurally defaulted unless he could show cause and prejudice for his default, or that a miscarriage of justice would result from a failure to hear the claims. The district court rejected Pitsonbarger's effort to show cause for his default by arguing ineffectiveness of appellate counsel and post-conviction counsel, noting that the claim about appellate counsel could have been raised in the state post-conviction hearing, and that there is no constitutional right to effectiveness of assistance of counsel in post-conviction hearings. See *Cawley v. DeTella*, 71 F.3d 691, 695 (7th Cir.1995); *Coleman v. Thompson*, 501 U.S. 722, 756-57, 111 S.Ct. 2546, 2568-69, 115 L.Ed.2d 640 (1991). See also AEDPA, 28 U.S.C. § 2254(b)(1).

We agree that the rules of procedural default prevent us from reaching these claims, troubling though they are. Under § 2254(e)(2), the federal court may not grant an evidentiary hearing on claims that a habeas petitioner could have developed in state court proceedings unless several criteria are satisfied. Either the claim must rely on a new rule of constitutional law, expressly made retroactive to cases on collateral review, or the factual predicate could not have been previously discovered with due diligence. § 2254(e)(2)(A). Furthermore, the applicant must show that the proffered facts underlying the claim "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). Nothing here indi-

cates why the facts on which Pitsonbarger now wants to rely could not have been discovered earlier with due diligence, notwithstanding his problems with earlier counsel. See also *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 11, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992) (habeas petitioner entitled to evidentiary hearing in federal court only if he shows cause and prejudice for failing to develop facts in state court). Pitsonbarger raised some claims about ineffectiveness of counsel before the Illinois Supreme Court, but he did not raise or develop his claims relating to the Librium use. We address those other claims below; as for the Librium claims, Pitsonbarger's failure to raise them on direct appeal, coupled with his failure to present his claim of ineffective appellate counsel based on that issue to the Illinois courts, bars him from relief now.

■ We understand that Pitsonbarger responded to Judge McDade's ruling on this point by filing the second postconviction petition in the Circuit Court of Peoria County, in an eleventh hour effort properly to present these claims to the state courts. This move was understandable, even if it was a long shot, given the deplorable quality of representation he received during his state postconviction hearings. His attorneys there missed the deadline for filing his post-conviction brief with the Illinois Supreme Court (and ultimately, the Illinois Court dismissed the post-conviction claims for want of prosecution), and the petitions they filed were of little or no use insofar as they raised only points that had been adjudicated on direct appeal and they failed to explore the questions that only now are coming to light (including the fitness for trial argument raised here). Nevertheless, it is well established that as a matter of federal law the Sixth Amendment is not violated by ineffective assistance of counsel during post-conviction proceedings. *Cawley,* 71 F.3d at 695; *Coleman,* 501 U.S. at 756–57, 111 S.Ct. at 2568–69. Pitsonbarger's remedy, if he has one at all, is to convince the state court in the proceedings now pending before it that he has a legally cognizable excuse for failing to bring this point before the state courts earlier. The State is of the view that there is virtually no chance of success in this exercise, because Illinois frowns on successive

habeas petitions just as sternly as the federal courts do. The one thing that is clear, however, is that this dispute is for the state courts, not for us.

■ Pitsonbarger's position is not improved by recasting his claim as one fitting within the "miscarriage of justice" exception to procedural default. He argues that his case fits within the miscarriage of justice rule because his mental condition at the time of trial made him ineligible for the death penalty, and notes in that connection the well established rule that due process is violated by the prosecution of a person who is not competent to stand trial. See, *e.g., Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Medina v. California,* 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). Unfortunately for Pitsonbarger, the AEDPA forecloses this line of argument, as it now provides (as we have already noted) that the new facts would be enough to show that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the *underlying offense.*" 28 U.S.C. § 2254(e)(2)(B) (emphasis added). Pitsonbarger offers nothing in this connection that would meet the requirements of § 2254(e)(2)(B); thus, we have no need to address the question whether the factual predicate he now offers could have been discovered previously through due diligence.

■ Pitsonbarger's other claims of ineffectiveness of counsel include the following: (a) failure to argue that his statements to the police were inadmissible because he had been denied access to counsel, (b) failure to investigate and secure a copy of the blood alcohol and/or drug report that might have shed light on the voluntariness of his statement to the police, (c) failure to object to the State's use of peremptory challenges to exclude persons with only a general objection to the death penalty, (d) failure to seek the appointment of a second attorney to assist in his representation, as recommended by the ABA "Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases" and National Legal Aid & Defender Association "Standards for the Appointment and Performance of Counsel in Death Penalty Cases," (e) failure to present a defense at

trial, (f) allowing irrelevant evidence to be introduced at the first stage of the sentencing hearing, (g) failing to object to the prosecutor's improper closing argument, (h) failing to object to erroneous instructions on the burden of persuasion at the sentencing hearing, and (i) failing to attack the constitutionality of the Illinois Death Penalty Act based on its "special assistance" provisions. Claim (f) was presented to the Illinois Supreme Court on direct appeal, and was rejected because the court found that Pitsonbarger failed to establish a reasonable probability that he was prejudiced by the additional evidence. See *Pitsonbarger,* 142 Ill.2d at 397, 154 Ill.Dec. at 581, 568 N.E.2d at 802 (applying *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). We conclude that the Illinois Court's analysis was reasonable, and thus that the writ may not issue on this ground. See § 2254(d)(1). The remaining ineffective assistance claims, meanwhile, all suffer from the same procedural defaults we have discussed in detail with respect to the Librium claim. Like that one, they cannot surmount either the "cause and prejudice" hurdle or qualify for the "miscarriage of justice" exception, as it now narrowly exists in the AEDPA.

### B. *Interstate Agreement on Detainers Act*

The Interstate Agreement on Detainers Act (IAD), 730 ILCS 5/3–8–9, is Illinois's version of a compact among forty-eight states in the United States (all but Louisiana and Mississippi), plus the District of Columbia and the United States, that allows a member state holding a prisoner to grant temporary custody to another member state for the disposition of outstanding charges against that prisoner. After Nevada prosecuted Pitsonbarger for his offenses there and he had begun to serve his multiple life sentences, Pitsonbarger filed a "Request for Disposition of Indictments, Informations or Complaints" in the Illinois case and consented to "a waiver of extradition to your state to serve any sentence there imposed upon me, after completion of my term of imprisonment in [Nevada]." Pursuant to this Request, Nevada offered to deliver temporary custody of Pitsonbarger under the IAD to Illinois.

Pitsonbarger's argument to this Court (which was properly presented both to the state courts and to the court below) is straightforward: because the IAD speaks clearly in terms of "temporary custody" of a prisoner for the receiving state (here, Illinois), and because Article V(e) says "[a]t the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state," he was entitled to be returned to Nevada to finish serving his multiple life imprisonment sentences there, before he could be returned to Illinois under Article III(e) to serve (or be subject to) his death sentence in Illinois. Normally, that is the way things work: the sending state loans the prisoner to the receiving state, the receiving state disposes of the charges, and the prisoner then returns to the sending state to complete his term of imprisonment there. If further imprisonment is due under a sentence imposed in the receiving state, the sending state again extradites him to the receiving state to finish that sentence.

In Pitsonbarger's case, the matter became more complex after he was sentenced to death in Illinois. At that time, the Governors of Illinois, Missouri, and Nevada entered into an Executive Agreement that specifically addressed Nevada's interest under Article V of the IAD, the Illinois death sentence, and the pending Missouri murder charges. The penultimate paragraph of that Executive Agreement provided as follows:

> IT IS ALSO AGREED that if Jimmy Pitsonbarger receives any sentence providing less than death in Missouri and the death sentence in Illinois is vacated, commuted, or otherwise permanently eliminated, he will be returned to Nevada to serve his life without possibility of parole. If one death sentence remains in effect, Jimmy Pitsonbarger will be housed in whatever state has said sentence in effect.

As Pitsonbarger points out, this paragraph is inconsistent with the terms of the original detainer under which Pitsonbarger was sent from Nevada to Illinois for trial, to the extent that it overrides the normal rule that he would be returned to Nevada after his Illinois sentence was imposed. Nonetheless, the question here is not whether the Executive Agreement changed the terms of the

original detainer. Two preliminary questions, which Pitsonbarger has consistently raised, would have to be answered favorably to him before we would be able to consider whether the Executive Agreement impermissibly contradicted the IAD and the retainer in Pitsonbarger's own case. The first is whether the Governors were entitled to enter into this kind of executive agreement without going through the procedures required by the Compact Clause of the Constitution, Art. I, § 10, cl. 3, which they concededly did not. Second, Pitsonbarger must show that he had a legally protectable interest in the original terms, such that he may complain about their alteration.

■ The Compact Clause forbids states from entering into any agreement or compact with one another without the consent of Congress. Congress may, however, give its consent in advance of an agreement. In the case of the IAD itself, Congress gave advance consent in the Crime Control Consent Act of 1934, 4 U.S.C. § 112. That Act states that "[t]he consent of Congress is hereby given to any two or more States to enter into agreements or compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies...." 4 U.S.C. § 112(a). In *Cuyler v. Adams*, 449 U.S. 433, 442, 101 S.Ct. 703, 708–09, 66 L.Ed.2d 641 (1981), the Supreme Court held that the IAD is a congressionally sanctioned interstate compact, the interpretation of which presents a question of federal law. See also *Carchman v. Nash*, 473 U.S. 716, 719, 105 S.Ct. 3401, 3403, 87 L.Ed.2d 516 (1985); *Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994).

In our case, of course, the question is not whether the IAD itself was lawfully enacted; it is whether the Executive Agreement of the Governors may validly modify a term we assume for the sake of argument exists in the IAD: the right of a prisoner to return to the sending state after receiving state procedures are concluded. Only two possibilities exist: either the Governors were free to enter into their Executive Agreement, because it was not a "combination tending to the increase of political power in the States" that might encroach on national sovereignty, see *United States Steel Corp. v. Multistate*

*Tax Comm'n*, 434 U.S. 452, 468, 98 S.Ct. 799, 810, 54 L.Ed.2d 682 (1978), quoting *Virginia v. Tennessee*, 148 U.S. 503, 519, 13 S.Ct. 728, 734, 37 L.Ed. 537 (1893), or the Executive Agreement, like the IAD, is an interstate compact. We need not decide which of those possibilities is the correct one here. If the Executive Agreement does not fall within the Compact Clause, then the three Governors were free to enter into it, and its terms govern Pitsonbarger's case. If it does fall within the Compact Clause, then it just as clearly benefits from the advance congressional consent given in the Crime Control Consent Act of 1934 as the IAD itself. It provides for a cooperative effort and mutual assistance in the enforcement of the three states' criminal laws and policies, and thus falls squarely within the scope of 4 U.S.C. § 112(a).

But, Pitsonbarger argues, he acquired some kind of vested interest in the promise of the authorities to return him to Nevada after the Illinois proceedings were concluded, in accordance with the original detainer. Insult was added to injury when one recalls that he initiated the IAD process himself under the Article III procedures, believing (we assume) that he had some kind of insurance against exactly what happened here because, at worst, he would face his multiple life sentences in Nevada. Had he known about the risk that an Illinois (or Missouri) death sentence would take priority, he might well have waited for a prosecutorial request for transfer under Article IV of the IAD, under which he had the right to contest extradition in a judicial hearing, as explained in *Cuyler*. 449 U.S. at 450, 101 S.Ct. at 712–13. Thus, he claims, whatever general right the Governors had to execute modifications to the IAD cannot apply to his case in a way that deprives him of the procedural protections he enjoyed at the outset of his proceedings.

In our view, Pitsonbarger's argument misses the mark when it asserts that the individual interests protected by the IAD extend to the place where a lawfully imposed sentence may be served. Article I of the IAD makes it clear that, insofar as individual interests may be created at all under the statute, they relate to the interest in "the expeditious and orderly disposition of [out-

standing charges and untried indictments]"—in other words, the right to a speedy trial. Thus, under Article III(a) of the IAD, a prisoner has the right to request a final disposition of outstanding charges in other jurisdictions (a right Pitsonbarger invoked), and if he does so, "he shall be brought to trial within 180 days" after he delivers his request to the prosecuting officer and the appropriate court in that officer's jurisdiction. Furthermore, Article III(d) assures him that such a request operates as a request for final disposition of all matters lodged against him in the state to whose prosecutor his request is addressed. As the Supreme Court explained at more length in *Reed v. Farley, supra,* Article IV(c) transfers at the request of the state in which untried charges are pending also carry with them the right to a prompt trial—in that case, within 120 days of the arrival of the prisoner in the receiving state. Although the *Reed* Court declined to equate the 120-day trial right in Article IV(c) with the Sixth Amendment guarantee of a speedy trial, 512 U.S. at 351–53, 114 S.Ct. at 2299, nothing it said indicated that the underlying prisoner interest protected by Article IV(c) was anything but prompt resolution of the charges.

Pitsonbarger's argument that the IAD also protects an alleged interest in where he will serve his sentence runs squarely against the ruling of *Ponzi v. Fessenden,* 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922), where the Supreme Court held (in the pre-IAD days) that a federal prisoner had no right to complain about the Attorney General's decision to consent to his transfer to state custody for the purpose of a trial on pending state charges. In language equally applicable to Pitsonbarger's situation, Chief Justice Taft wrote:

> One accused of crime has a right to a full and fair trial according to the law of the government whose sovereignty he is alleged to have offended, but he has no more than that. He should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial. He may not complain if one sovereignty waives its strict right to exclusive custody of him for vindication of its laws in order

that the other may also subject him to conviction of crime against it.

*Id.* at 260, 42 S.Ct. at 310–11. See also *Jeter v. Keohane,* 739 F.2d 257 (7th Cir.1984). Here, the party with an interest in Pitsonbarger's return to Nevada to serve out the remainder of his sentence there was the State of Nevada itself. Through the Executive Agreement, Nevada conditionally waived its right to demand Pitsonbarger's return, by stipulating that either Illinois or Missouri could carry out a death sentence if one were imposed and ultimately upheld, but that Pitsonbarger would be returned to Nevada otherwise. As the New Jersey Supreme Court put it in *State v. Robbins,* 124 N.J. 282, 590 A.2d 1133 (1991), a case with facts remarkably similar to those here:

> [The defendant] owe[s] a debt to two different sovereigns. Under our law these debts must be paid, and it is not up to the accused to determine in what order they should be paid.

124 N.J. at 289, 590 A.2d at 1137, quoting *Guerrieri v. Maxwell,* 174 Ohio St. 40, 46, 186 N.E.2d 614, 618 (1962). Similarly here, Pitsonbarger owed a debt ultimately to three sovereigns. It has been clear since at least 1922, when *Ponzi* was decided, that he had no right to pick and choose the order in which he would serve his three sentences. The IAD simply sets forth the normal rule that the sending state will take priority, but it says nothing to indicate that the sending state's discretion to waive that right has been restricted or eliminated. The Executive Agreement therefore controls Pitsonbarger's case, and he must remain in Illinois pursuant to its terms unless the Illinois death sentence is "vacated, commuted, or otherwise permanently eliminated," in which event Illinois has agreed to return him to Nevada.

 We note finally that the fact that Illinois handled the case of Maurice McDonald differently from the way it handled Pitsonbarger's does not suggest a violation of the Equal Protection Clause of the Constitution. Although McDonald too received life sentences in Nevada and the death penalty in Illinois, he was returned to Nevada, unlike Pitsonbarger. This means only that Nevada did not waive its right to insist on such a return in McDonald's case, as it did here.

Furthermore, there is no showing that McDonald's crimes were the same as Pitsonbarger's, or that the Governors somehow abused their discretion in concluding that the circumstances of Pitsonbarger's case required a different outcome. Furthermore, Pitsonbarger's effort now to argue that the Executive Agreement in this case violated his rights under the Contracts Clause, U.S. Const. Art. I, § 10, cl. 1, is too late. Because he did not present this argument to the state court and failed to develop it here, it is waived. See 28 U.S.C. § 2254(e)(2); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) (waiver applies where arguments are not developed).

## C. Sentencing Jury Claims

■ 1. *Private Deliberations.* In this part of the petition, Pitsonbarger points out that jurors Dorothy Gillmore and Mary Geber engaged in private deliberations about his case while they were sequestered overnight, contrary to the trial court's instructions. Gillmore was one of only two jurors who had been holding out against the imposition of the death penalty. She discussed those reservations and the case as a whole with Geber, and she reported that Geber was able to dispel some of her anxieties and concerns about the case. The next morning, after an additional hour and fifteen minutes of deliberation, the jury announced its verdict sentencing Pitsonbarger to death.

■ In his federal habeas petition, Pitsonbarger recounted these facts and argued that they demonstrated a violation of his constitutional right to an impartial jury. Under *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), private communications with a juror are presumptively prejudicial. The state responded that the *Remmer* rule applies to outside influences on the jury, not to intra-jury conversation, and that in any event, Pitsonbarger procedurally defaulted this claim by failing to present it to the state courts. The district court agreed that the claim was defaulted, noting that Pitsonbarger first raised it in his supplemental memorandum in support of his motion to reconsider and vacate the Circuit Court's denial of his state post-conviction petition. He then attempted to present it to the Illinois Supreme Court, but this was in a brief that the court refused to accept for filing on the ground that it was untimely. (The latter problem is part of his complaint that counsel was ineffective, but as we noted above, we cannot grant habeas relief on the ground of ineffectiveness of counsel in post-conviction proceedings.) The district court properly found procedural default under these circumstances.

■ 2. *Dismissals for Cause.* At the trial, the court dismissed prospective jurors Terry Harter, Bernadine Anderson, and Harriet Ottenweller for cause, on the ground that they had an aversion to imposing the death penalty. This issue was properly presented to the state court; nevertheless, upon reviewing the *voir dire*, the district court concluded that the state judge was within his discretion in excusing those jurors for cause based upon their opposition to the death penalty. When asked whether she "just couldn't impose the death sentence no matter what the evidence and the law is," prospective juror Anderson replied, "[t]hat would probably most likely be the case, yes." Similarly, in response to the court's question "[a]re you saying that you just could not impose the death penalty in any case, no matter what the evidence, circumstances, or the law is," prospective juror Ottenweller said, "I think maybe I am." Prospective juror Harter told the court that he believed the death penalty was morally wrong. After commenting that he was not as adamantly opposed to it at the present as he once was, and indicating his understanding of the need for the rule of law, the court asked him whether he would go into a sentencing hearing with a preference against the death penalty unless he could be convinced otherwise. He replied, ". . . I say I'm ambivalent, but I'm not, I couldn't be unbiased about that. I just, not my vocation."

■ A juror in a capital case may be excused for cause if his views about the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (internal quotations omitted). The trial judge's determination of bias is a factual

determination entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). See also *Wainwright,* 469. U.S. at 426, 105 S.Ct. at 853–54. The Illinois Supreme Court considered this claim on direct appeal, *Pitsonbarger,* 142 Ill.2d at 381–88, 154 Ill.Dec. at 573–74, 568 N.E.2d at 794–97, applied the correct legal standard, and held that the trial judge did not err. Given the AEDPA standard for issuing a writ of habeas corpus, both the state court's factual findings and the Illinois Supreme Court's decision fully support the district court's ruling on this claim.

■■■ 3. *Peremptory Challenges.* Another prospective juror, William Lee, displayed a predisposition in favor of the death penalty. During *voir dire,* Lee stated that he was "for the death penalty," and that he regarded it as the appropriate penalty for a case of multiple first-degree murders. But when the court asked him whether he had. already concluded that he would favor the death penalty in Pitsonbarger's case, Lee responded "[n]o. I have not because I, I haven't really followed the case closely." He indicated that he would not approach his duties as a juror with the feeling that the death penalty should be imposed unless the defense convinced him otherwise. On the other hand, most troublingly, he told the court that he agreed that there were some cases "where just automatically jurors ought to vote for the death penalty without paying any attention to circumstances or law or evidence." Ultimately, he told the court that he would be fair to both sides if selected as a juror. When the court refused to grant Pitsonbarger's motion to dismiss him for cause, the defense used one of its peremptory challenges to strike Lee from the panel.

Because Lee ultimately did not sit on Pitsonbarger's jury, the claim about the trial court's failure to dismiss Lee for cause cannot succeed unless Pitsonbarger shows that the jury that did sit was not impartial. See *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988) ("[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result·does not mean the Sixth Amendment was violated"). Again, we agree with the district court that *Ross* requires rejection of the claim regarding Lee.

■■ Pitsonbarger also complains that the state unlawfully used its peremptory challenges to remove jurors who were opposed to the death penalty. At present, however, there is no rule of law prohibiting this practice, notwithstanding the erosion of the notion that a peremptory challenge may be exercised for any reason whatsoever that has occurred in the wake of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (race-based use of peremptories forbidden), and *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (gender-based use of peremptories forbidden). See generally Kenneth Melilli, Batson *in Practice: What We Have Learned About* Batson *and Peremptory Challenges,* 71 Notre Dame L.Rev. 447 (1996). Furthermore, this was one of the claims that was procedurally defaulted because it was not raised before the state court.

### D. *Evidentiary Claims and Prosecutor's Arguments*

■■ 1. *Evidentiary claims.* At the trial, the state introduced evidence that Pitsonbarger had engaged in "window peeping" and public indecency in the past, even though he had never been charged or tried on these incidents. The Illinois courts and the district court all found that this evidence was admissible under Illinois law, provided that it "bore upon the likelihood ... that [the] defendant would commit other offenses; it appeared trustworthy," and the defendant had an opportunity to cross-examine the witness. See, *e.g., People v. Johnson,* 128 Ill.2d 253, 284, 131 Ill.Dec. 562, 576, 538 N.E.2d 1118, 1132 (1989), citing *People v. La Pointe,* 88 Ill.2d 482, 498–99, 59 Ill.Dec. 59, 66, 431 N.E.2d 344, 351 (1981). Those safeguards are ample to satisfy constitutional standards under the due process clause for the admission of evidence, and the district court correctly rejected Pitsonbarger's argument that death penalty cases·require a higher standard.

■■■ Second, Pitsonbarger complains that the eligibility phase of his sentencing hearing was prejudiced by the improper introduction of victim impact evidence. His trial took place before the Supreme Court decided *Payne v. Tennessee,* 501 U.S. 808,

827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), which held that the federal constitution does not prohibit the use of victim impact statements. See also *People v. Howard,* 147 Ill.2d 103, 158, 167 Ill.Dec. 914, 937, 588 N.E.2d 1044, 1067 (1991) (adopting *Payne*). Relying on *Payne,* we have restricted our review of claims relating to victim impact statements (even where the trial and direct appeal preceded the decision in *Payne*) to the question of whether the introduction of the evidence rendered the proceeding fundamentally unfair. *Williams v. Chrans,* 945 F.2d 926, 947 (7th Cir.1991). Focusing on that issue, the Illinois Supreme Court held that the victim impact statements here did not deny Pitsonbarger his right to a fair trial, particularly in light of the strong evidence showing his eligibility for the death penalty. *Pitsonbarger,* 142 Ill.2d at 395, 154 Ill.Dec. at 579–80, 568 N.E.2d at 800–01. Because the Illinois Court applied the correct rule, and we are unable to say that its application was unreasonable, Pitsonbarger's claim fails.

■■■■ 2. *Prosecutor's arguments.* During his closing argument at the eligibility stage of the sentencing hearing, the prosecutor argued to the jury that the murders for which Pitsonbarger had been convicted had been done intentionally. The indictment, in contrast, charged only that he had undertaken these actions knowing that they created a strong probability of death or bodily harm. Pitsonbarger claims now that the prosecutor's argument violated his rights to due process, because he was not on notice that he would be required to defend against a charge of intentional killings. See *Cole v. Arkansas,* 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948); *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). Once again, this claim was never raised before the state courts, and for the reasons already stated it is therefore procedurally barred. In any event, a juror who believed the prosecutor's formulation would have required more evidence to find Pitsonbarger eligible for the death penalty, not less; the error, if any, was not prejudicial to him.

■■■■ At the conclusion of the second stage of the sentencing hearing, the prosecutor argued (1) that Pitsonbarger might kill a guard or another inmate if he was sentenced only to life imprisonment, and (2) that Pitsonbarger might have killed again if the police had not apprehended him. The state courts considered these claims and concluded that, while the first argument may have been improper, Pitsonbarger was not denied a fair trial due to the overall weight of the evidence against him. The Illinois Supreme Court found the second comment to be reasonably based on evidence introduced at trial. *Pitsonbarger,* 142 Ill.2d at 403, 154 Ill.Dec. at 583–84, 568 N.E.2d at 804–05. The appropriate standard in such cases is to determine first whether the argument was in fact improper, and if it was, to see if the defendant was denied a fair trial based on the record as a whole because of the prosecutor's misconduct. See *United States v. Goodapple,* 958 F.2d 1402, 1410 (7th Cir.1992). See also *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985). Again, applying 28 U.S.C. § 2254(d)(1), we conclude that the Illinois courts applied the correct legal standard and their application of the law to the facts was reasonable.

### E. Counsel's Alleged Conflict of Interest

■■■■ This claim is procedurally barred, and in any event it is without merit. Pitsonbarger has argued to this Court that because his appointed trial counsel served at the pleasure of the state court judges, counsel labored under a conflict of interest that could have caused him to refrain from taking certain actions on his client's behalf for fear of falling out of favor with the court. He offers nothing to show that his lawyer had an actual conflict of interest, and in the absence of such a showing, relief is unavailable. See *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980). Furthermore, this smacks of biting off one's nose to spite one's face: a ruling that public defender programs are flawed at the core because the attorneys all have a conflict would be catastrophic for the representation of criminal defendants everywhere.

### F. Illinois Death Penalty Act

Illinois law provides that persons who need a translator or special assistance at the trial may be unfit to stand trial, and further if they have been convicted after a proceeding

which was able to proceed only with some form of special assistance, they are not subject to the death penalty. See 725 ILCS 5/104–10, 5/104–22, 5/104–26(b). Pitsonbarger contends that this rule creates an arbitrary distinction regarding which defendants are eligible for the death penalty. Like many of the other claims we have discussed, this one is procedurally barred. In addition, the distinction does not appear to be arbitrary, as it serves to prevent the death penalty from being imposed on someone whose trial is subject to greater than normal reliability concerns. See *People v. Young*, 128 Ill.2d 1, 63–64, 131 Ill.Dec. 86, 104–05, 538 N.E.2d 461, 479–80 (1989).

■ Finally, in one sentence, Pitsonbarger attempts to argue that the Illinois Death Penalty statute is unconstitutional. As we have frequently noted, such cursory treatment is not enough to preserve an issue for appellate review, and we therefore deem this point waived. See *United States v. Eddy*, 8 F.3d 577, 583 (7th Cir.1993); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) ("We have repeatedly made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). See also *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1388–89 (7th Cir.1994) (*en banc*) (rejecting constitutional challenge to Illinois death penalty statute); *Davis v. Greer*, 13 F.3d 1134, 1141–44 (7th Cir.1994) (same); *Williams v. Chrans*, 945 F.2d 926, 935–39 (7th Cir.1991) (same); *Silagy v. Peters*, 905 F.2d 986, 991–1009 (7th Cir.1990) (same).

### III.

To the extent that Pitsonbarger has raised other claims in his brief, we have nothing to add to the district court's analysis of them. We conclude that, on the state of the record properly before us, Pitsonbarger is not entitled to federal habeas corpus. As we noted at the outset, our decision is without prejudice to the state court's ability to entertain (or to reject) the state law claims now being presented in his second petition for post-conviction relief, including his assertion of a right to develop additional facts on certain issues. We warn him, however, that any new federal petition for habeas corpus will need to meet the requirements of 28 U.S.C. § 2244(b). The judgment of the district court is AFFIRMED.

### ORDER ON REHEARING
#### Feb. 20, 1997

■ In his petition for rehearing, Jimmy Ray Pitsonbarger argues that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996), codified at 28 U.S.C. § 2254, governing the "miscarriage of justice" exception to procedural default, should not apply to his case under the retroactivity analysis we followed in *Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996), and if the AEDPA by its terms must be applied retroactively here, it would be unconstitutional. Under *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), Pitsonbarger's procedural default could have been excused not only by a showing that he was actually innocent of the underlying offense, but also by "clear and convincing evidence that but for constitutional error, no reasonable juror would [have found] him eligible for the death penalty" under Illinois law. *Id.* at 348, 112 S.Ct. at ——. As we pointed out in our opinion, under the AEDPA, ineligibility for the death penalty is no longer enough to excuse procedural default. Instead, new facts must demonstrate that "but for constitutional error, no reasonable fact finder would have found the applicant guilty of the *underlying offense.*" 28 U.S.C. § 2254(e)(2)(B) (emphasis added). This change, Pitsonbarger argues, is enough to attach new legal consequences to his earlier act of default, because it removes one ground on which he might have relied to have his case heard. See also *Burris v. Parke*, 95 F.3d 465 (7th Cir.1996).

Pitsonbarger's argument, which asserts that an application of the AEDPA standards to this kind of claim would fall within the *Burris* exception to *Lindh*, has some force. We therefore modify our original opinion to make it clear that we are leaving open the question whether the procedural default rule of 28 U.S.C. § 2254(e)(2)(B) may be applied retroactively in these circumstances. In this case, however, upon full consideration of the petition for rehearing, the State's response, and the record previously before us, we con-

clude that Pitsonbarger's claim would not have qualified for the *Sawyer* "miscarriage of justice" exception under the pre-AEDPA law. Pitsonbarger's principal claim is that he was entitled to a fitness hearing. As the State points out, it is possible that the outcome of such a hearing might have been a finding that he was unfit to stand trial, and he might thereafter have been tried using the special procedures available under 725 ILCS 5/104–22 (instead of being committed and having his trial later under ordinary procedures), but this is speculative. It does not rise to the level of the "clear and convincing evidence" that he was unfit to stand trial called for by *Sawyer.* Therefore, even on the assumption that the AEDPA miscarriage of justice rules do not apply to pending cases like Pitsonbarger's, we find here that his procedural default was not excused.

In all other respects, we reaffirm our original opinion. No judge in regular active service has requested a vote on the suggestion of rehearing *en banc*, and, with this addendum, all of the judges on the panel have voted to deny rehearing. The petition for rehearing is therefore **DENIED.**