**James B. ASHFORD, Petitioner–Appellant,**

v.

**Jerry D. GILMORE, Warden, Respondent–Appellee.**

No. 98–1353.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 16, 1998.

Decided Feb. 5, 1999.

Richard D. Frazier, Metnick, Wise, Cherry & Frazier, Springfield, IL, Alan M. Freedman (argued), Midwest Center for Justice, Ltd., Chicago, IL, for Petitioner–Appellant.

Michael M. Glick (argued), Office of the Attorney General, Chicago, IL, Deborah L. Ahlstrand, Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Respondent–Appellee.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

MANION, Circuit Judge.

On June 12, 1985, James Ashford murdered four people in Springfield, Illinois and stole $10,000 and a bag full of cocaine. He waived his right to a jury, and the Illinois state trial court convicted him of murder and armed robbery. Contrary to advice of his counsel, Ashford also waived a jury for the sentencing hearing, and the trial court sentenced him to death. Having exhausted his state remedies, Ashford filed a habeas corpus petition under 28 U.S.C. § 2254. He claimed that his attorney provided ineffective assistance of counsel by honoring his request not to present evidence of mitigation. Also, Ashford claimed that a memo regarding security concerns, presented to the sentencing judge two days before sentencing, denied him due process of law. The district court denied the petition for the writ of habeas corpus, and we affirm.

### I.

The facts of this case, which we must presume to be correct, *see* 28 U.S.C. § 2254(e)(1), are drawn from the decisions of the Illinois Supreme Court:

The State presented the following evidence at trial. Ellen Michelle Lawson testified that on the evening of June 12, 1985, she went to buy some marijuana at the home of Lonnie Davis, at 1714 East Stuart Street in Springfield, Illinois. Four persons were there when she arrived, at approximately 10 p.m.: Lonnie Davis; Davis' girlfriend, Annette Singleton; his sister Janetta Leaks; and Bernard Bowen. Bowen greeted Michelle at the front door, which led to the home's living room. After letting her in, Bowen took a seat at the table in the dining room, a room immediately adjacent to the living room. On the dining room table was a scale, a mirror, a large freezer-type bag filled with a white powdery substance, and a briefcase containing several stacks of United States currency. Bowen was weighing the white substance, which Michelle believed was cocaine. Michelle walked through the dining

room to the kitchen, where she saw Leaks and Singleton. The two women were eating. She then went into the bedroom adjacent to the kitchen to talk with Davis. While the two were talking, the front doorbell rang several times. Michelle testified that Bowen answered the door and then exchanged a few words with Davis. Shortly afterwards, Michelle heard a voice outside, which she recognized as that of Gary Jones, say: "F—k that, let me in." Two gunshots followed. Davis, Leaks and Singleton all ran to the living room. Michelle remained in the bedroom and, from there, she heard the two women scream and run back into the kitchen.

Michelle attempted to flee the house by a door in the bedroom that led to the outside. The door, however, was locked with a dead-bolt and could not be opened without a key. After hearing three or four more gunshots, Michelle retreated down the basement stairs and hid behind the washer and dryer. Michelle heard screaming and three or four more shots. She heard Annette Singleton beg for her life to be spared, followed by four more shots. She then moved to the bedroom in the basement and hid between the bed and a wall.

As she lay on the basement floor underneath the bed, Michelle heard still four more shots and then the sound of footsteps descending the basement stairs. She testified that from underneath the mattress, she could see a pair of feet wearing canvas-type tennis shoes and the bottoms of a pair of black pants or jeans. While the feet were still in her sight, Michelle heard a voice from upstairs, which she recognized as that of Gary Jones. She then heard a voice, which she recognized as that of the defendant's, respond from the basement: "I'm coming. I'm coming, man." The defendant went back upstairs. Michelle remained under the bed about five minutes longer, during which time the house was silent. She then ventured upstairs.

Michelle observed the bodies of Davis, Leaks and Singleton on the kitchen floor, the bodies of the two women huddled close together under the kitchen table. As she headed for the front door, Michelle passed through the dining room. Michelle testified that the freezer bag of white powder and the money she had seen earlier on the dining room table were no longer there. She found Bowen's body in the living room near the front door to the house.

*Illinois v. Ashford*, 121 Ill.2d 55, 117 Ill.Dec. 171, 520 N.E.2d 332, 333–34 (Ill.1988) ("*Ashford I*"). Ashford related his version of the murders to Janet and Ramona Walker, who then testified at trial:

Janet Walker and her sister Ramona Walker testified that the defendant and Mack Alexander came to Janet's home around 8 p.m. on June 15, 1985. The defendant had some cocaine, which he poured onto a plate and divided into lines. All four snorted the cocaine. The defendant told them that because they were all family (distant cousins), he was going to tell them something they were not to repeat. The defendant then told how he and Gary Jones went to Davis' home on June 12. He said that when Bowen opened the door, he pulled out his pistol and shot Bowen. He told them how one of the women in the kitchen had pleaded with him, "Pud, don't kill me." The defendant stated that he shot her because she called out his nickname.

Ramona did not recall if the defendant said whether he, Jones or both had shot the other women or Lonnie Davis. She recalled that the defendant said something about Jones being in the basement and stated that she had to leave the room several times, once because she had to vomit. Janet testified that the defendant said that he shot both the other women and Davis. The leg of one of the victims was shaking and so the defendant shot each victim in the head to make sure they were dead. Jones and the defendant then took the money and cocaine in two briefcases. They later split the money, each taking $5,000. The defendant stated that they had planned the robbery and explained that when that kind of money and drugs are involved, "you don't leave anyone alive." Pointing his hand at each of their heads, as though he were holding a gun, the defendant stated: "I shot them

like this." He stated further that he had paid someone $50 apiece to get rid of the guns used to kill the victims.

*Ashford I,* 117 Ill.Dec. 171, 520 N.E.2d at 335–36.

Ashford had paid $100 to have Greg Phillips dispose of the weapons; however, Phillips eventually led the police back to where he buried the guns. The guns' serial numbers identified the guns as being purchased by Ashford, and forensic scientists testified that Ashford's fingerprint was on one of the guns, and that the bullets which had killed the victims were fired from these guns. Dr. Grant Johnson, a forensic pathologist, testified that Bernard Bowen died from two gunshot wounds to the chest, one piercing his heart and the other perforating the aorta. He also testified that Annette Singleton, Lonnie Davis and Janetta Leaks all died from gunshot wounds to the head.

Ashford's trial was severed from Jones'. Ashford waived trial by jury, and was convicted of four counts of knowing murder, four counts of felony murder, and one count of armed robbery. Two days before the sentencing hearing was held, Lieutenant Sam Huston, an assistant jail administrator for the sheriff's department, sent the state court judge in this case a letter discussing safety precautions to be utilized at the sentencing hearing. This letter read:

> Your Honor, it has been brought to my attention that Inmate James Ashford has let it be known to another Inmate that he intends or has at least made reference to the fact that he (Ashford) is going to become a problem in the Court, following his sentencing. The outcome of this sentence, is of course known only to you at this time, but I submit that it shall be severe and Mr. Ashford may well have nothing to lose by a display of this type which could become quite serious. We have spoken to Mr. Roberts [the prosecutor in Ashford's case] about this matter and he seems to be in favor of our staff keeping hand-cuffs with a security belt and leg-irons on this individual throughout the entire process on the 16th.

> With all due respect to the Court, I ask for your approval in this matter and although as unusual as it may seem, I can assure you that many members of our staff has observed a growing sense of hostility and apprehension with this Inmate. Further I ask for your order to set up a metal detecting search procedure with all observers and that we utilize the smallest Court room available to limit the size of the gallery.

> Mr. Ashford and his friends are all quite familiar to us and sudden and violent outbursts, are their trademark. I have requested these considerations of you, not because of a paranoid or fearful hunch, but because we know the capabilities of this individual and have received enough "grapevine" information to predicate these precautions.

A copy of this letter was also sent to the state prosecutor, but not to Ashford or his counsel.

On April 16, 1986, Ashford's sentencing hearing was held. Ashford's counsel argued against the death penalty based on the fact that Ashford had never been previously convicted of a felony, and that in the alternative, Ashford would have to be sentenced to life imprisonment without parole. (Under Illinois law, a mandatory sentence of life imprisonment without the possibility of parole (or "natural life") is the only alternative to a death sentence when a defendant has been convicted of murdering two or more persons. *See* 730 Ill. Comp. Stat. 5/5–8–1(a).) The judge sentenced Ashford to death on the murder counts, and to thirty years' imprisonment on the armed robbery count. Ashford appealed his conviction and sentence.

On direct review, the Illinois Supreme Court affirmed his conviction and sentence, *Ashford I,* 121 Ill.2d 55, 117 Ill.Dec. 171, 520 N.E.2d 332 (Ill.1988), and the United States Supreme Court denied his petition for certiorari, 488 U.S. 900, 109 S.Ct. 246, 102 L.Ed.2d 234 (1988). Ashford's state petition for postconviction relief was similarly unsuccessful. See 168 Ill.2d 494, 214 Ill.Dec. 237, 660 N.E.2d 944 (Ill.1995) (*"Ashford II"*), *cert. denied,* —— · U.S. ——, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996). He then filed this petition for federal habeas corpus relief, which the district court denied. The district court

also denied Ashford a certificate of appealability. He requested a certificate of appealability from this court, and on April 8, 1998, we granted a certificate of appealability on two issues. The first issue is whether Ashford's trial counsel provided ineffective assistance of counsel by heeding his client's advice not to produce evidence which would tend to mitigate his sentence. The second issue is whether the sentencing judge's receipt of an *ex parte* memorandum regarding potential security issues at the sentencing pronouncement denied Ashford due process of law.

## II.

As amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254 authorizes the issuance of a writ of habeas corpus only if the challenged decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

■ We first address whether Ashford's trial counsel provided ineffective assistance of counsel during the sentencing phase of the trial. Ashford contends that the Illinois Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This court gives some deference to the state court's application. "[O]nly a clear error in applying *Strickland*'s standard would support a writ of habeas corpus." *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir.1997) (citing *Porter v. Gramley*, 112 F.3d 1308, 1312–14 (7th Cir. 1997); *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir.1997); *Pitsonbarger v. Gramley*, 103 F.3d 1293, 1297 (7th Cir.1996); and *Neal v. Gramley*, 99 F.3d 841, 843 (7th Cir.1996)).

Ashford, however, asks to abandon this standard, and instead adopt the approach of the First Circuit. *See O'Brien v. Dubois*, 145 F.3d 16, 21–23 & n. 4 (1st Cir.1998). In *O'Brien*, the First Circuit stated that *Hall v. Washington*, 106 F.3d 742 (7th Cir.1997),

conflicts with the other Seventh Circuit precedent regarding the appropriate standard of review. We disagree. In *Hall*, we noted that the AEDPA "allows the state court's conclusion to stand if it is one of several equally plausible outcomes." 106 F.3d at 749. We also noted that "the AEDPA imposes a higher burden on habeas petitioners than the prior law ...." *Id.* This is entirely compatible with the clear error standard articulated in *Holman*. More significantly for this case, *O'Brien* cites *Hall* for the proposition that "for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." 145 F.3d at 25 (citing *Hall*, 106 F.3d at 748–49). Thus, we see no need to revisit our standard of review for *Strickland* claims presented through a habeas petition, or our analysis of the AEDPA. *See Lindh v. Murphy*, 96 F.3d 856, 870–74 (7th Cir.1996) (*en banc*), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Therefore, unless the Illinois Supreme Court clearly erred in applying *Strickland* to Ashford's claim, Ashford's claim must be denied.

■ *Strickland* requires Ashford to show that (1) his counsel's performance fell below an objective standard of reasonableness, 466 U.S. at 688, 104 S.Ct. 2052, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694, 104 S.Ct. 2052 (in other words, that petitioner suffered prejudice from counsel's performance). There is a "strong presumption that counsel rendered reasonably effective assistance," *United States v. Limehouse*, 950 F.2d 501, 503 (7th Cir.1991) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (citation and quotation omitted). To establish prejudice under *Strickland*, a defendant must satisfy a similarly high threshold. "[A] criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Lockhart v. Fretwell*,

506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052); *see also Eddmonds v. Peters,* 93 F.3d 1307, 1313 (7th Cir.1996) ("Prejudice in the *Strickland* sense refers to 'unprofessional errors' so egregious 'that the trial was rendered unfair and the verdict rendered suspect.' ") (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). As applied to sentencing in a death penalty case, prejudice requires a showing "that a reasonable probability exists that, but for counsel's substandard performance, the sentencer 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " *Hall v. Washington,* 106 F.3d at 749 (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052). Moreover, failure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim. *See Velarde v. United States,* 972 F.2d 826, 828 (7th Cir.1992).

■ Ashford argues if his counsel had presented evidence that Ashford was addicted to and under the influence of cocaine and Valium at the time of the murders, there is a reasonable possibility that the judge would not have sentenced Ashford to death. The Illinois Supreme Court held that assuming the failure to offer this evidence constituted deficient performance, Ashford still failed to show prejudice. The court noted that cocaine use could be aggravating, instead of mitigating. *Ashford II,* 214 Ill.Dec. 237, 660 N.E.2d at 949 (citing *Illinois v. Jones,* 144 Ill.2d 242, 162 Ill.Dec. 15, 579 N.E.2d 829 (Ill.1991)). It also commented that the evidence showed that Ashford acted with a cool and calculating demeanor, and knew exactly what he was doing when he committed the four murders in this case. *Id.* The Illinois Supreme Court also considered the aggravating factors present in this case: the multiple murders, the deliberateness of Ashford's plan as he executed each potential witness, and his lack of remorse in retelling his account of the murders three days later. *Id.,* 214 Ill.

Dec. 237, 660 N.E.2d at 949–50. The Illinois Supreme Court concluded that there was no reasonable probability that evidence of drug use would have changed Ashford's sentence. *Id.,* 214 Ill.Dec. 237, 660 N.E.2d at 949.

Reviewing this same analysis, we conclude that the Illinois Supreme Court did not clearly err in holding that Ashford had failed to establish prejudice. The trial record establishes that the robbery and murders were premeditated, and that Ashford attempted to conceal his crime. Moreover, while it appears that Ashford used cocaine and other drugs shortly before the murders, we see no evidence supporting the view that Ashford's judgment or memory was impaired by the drugs. The manner in which the executions were carried out inside Davis' house also favors aggravation, and cuts against an argument of mitigation. All of the victims were shot multiple times, and three of the four victims were killed with close-range shots to the head. Under these circumstances, the Illinois Supreme Court did not unreasonably apply *Strickland* when it concluded that Ashford would have been sentenced to death even if this evidence were presented.[1]

■ The second issue advanced by Ashford involves the security memo which the sentencing judge received shortly before sentencing. Ashford contended before the Illinois Supreme Court that the *ex parte* nature of the letter, and the concomitant denial of an opportunity to rebut the facts therein, denied him due process of law. Ashford reiterates this argument to us, adding that the decision of the Illinois Supreme Court is contrary to *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). This claim presents a pure question of law, which we review *de novo. See Lindh,* 96 F.3d at 869 (AEDPA does not "purport to limit the federal courts' independent interpretive authority with respect to federal questions.").

As a judge is responsible for the safety precautions taken in his courtroom, the assistant jail administrator properly addressed

---

1. The district court also concluded that Ashford's counsel performed acceptably, and therefore, Ashford could not meet the first prong of the *Strickland* test. Ample evidence supports this view, including the testimony of trial counsel which indicates that Ashford himself requested that no mitigation evidence be presented. However, as the Illinois Supreme Court did not reach this issue, and it is unnecessary for our decision, we need not review it.

the letter to him. *See, e.g., In re Staley*, 67 Ill.2d 33, 7 Ill.Dec. 85, 364 N.E.2d 72, 73 (1977).[2] However, the Illinois Supreme Court found that the failure to share this letter with Ashford's counsel was error. *Ashford II*, 214 Ill.Dec. 237, 660 N.E.2d at 950. But the Illinois Supreme Court also found that the error was harmless. We agree.

The letter itself does not relate any specific instances of bad conduct by Ashford. Instead, it relates hearsay and "grapevine" information—information which any judge would know is not sufficiently credible to support a judicial finding. Moreover, considering this same judge had recently concluded that Ashford had executed four persons, we doubt that a letter suggesting that Ashford might be a problem would be surprising or prejudicial.

■ But we need not speculate whether or not the trial judge was improperly influenced by this letter: the trial judge stated his reasons for imposing the death penalty, and the security memo was not one of them. And even in the absence of such a statement, the law presumes that judges are not influenced by improper evidence brought before them. *See, e.g., United States ex rel. Placek v. Illinois*, 546 F.2d 1298, 1305 (7th Cir.1976) ("[W]hen we have held that evidence was improperly admitted in a bench trial, we have refused to presume that the trial judge considered it in reaching his verdict.") (citing *United States v. Stanley*, 411 F.2d 514, 516 (7th Cir.1969); *United States v. Menk*, 406 F.2d 124, 127 (7th Cir.1969)); *see also Illinois v. D'Arezzo*, 229 Ill.App.3d 428, 171 Ill.Dec. 256, 593 N.E.2d 1076, 1080 (1992). Ashford has failed to establish that if the security memo had been provided to him or his counsel, he would not have been sentenced to death.

This conclusion is not contrary to *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In *Gardner*, the Su-

preme Court ruled that the Due Process Clause was violated when a judge relied, in part, on confidential portions of a presentence report. The *Gardner* trial court specifically stated that his death penalty decision was based in part on the information contained in the presentencing report. In contrast, the security memo in this case was not relied on by the district court, and did not pertain to sentencing issues at all. Moreover, the letter contains nothing more than a suspicion that a security problem might be present. This differs greatly from the type of information contained in Gardner's presentence report. Finally, *Gardner* specifically states that the trial court may disregard disputed information. *Id.* at 359–60, 97 S.Ct. 1197. The implication of this statement is that merely being aware of the contents of the *ex parte* information is not sufficient to raise a constitutional error. *Gardner* is distinguishable from Ashford's case, and the Illinois Supreme Court's denial of Ashford's due process claim was not contrary to *Gardner*.

■ As a final matter, we reject Ashford's argument that the *ex parte* nature of the security memo constitutes a structural error not susceptible to harmless error analysis. In *Chapman v. California*, the Supreme Court held that except in limited circumstances, constitutional errors were subject to harmless error analysis. 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). These limited circumstances, involving what the Supreme Court calls "structural errors," include the right to counsel, *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); the right to a unanimous jury verdict beyond a reasonable doubt, *see Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); the unlawful exclusion of jurors based on race, *see Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); and the right to represent one's self, *see McKaskle v. Wiggins*,

---

**2.** This case also holds that an accused defendant should not be physically restrained at trial unless there is a clear necessity for it. The record does not reveal whether Ashford was in fact shackled at sentencing, but Ashford's counsel at oral argument stated Ashford was. Ashford has presented neither a sufficient factual record nor legal argument regarding the use of restraints. Moreover, nothing in *Staley* suggests that the rule against physical restraints amounts to a constitutional error. Therefore, we need not address it.

465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). But *ex parte* communications do not make this list. In *Rushen v. Spain*, the Court held that *ex parte* communication between a judge and juror is subject to harmless error review. 464 U.S. 114, 118, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam). The Court also rejected any notion of an "inherent bias" caused by such *ex parte* communication. *Id.* at 119, n. 3, 104 S.Ct. 453. Further, we note that even some structural errors, such as violations of the right to counsel, have been held to be subject to harmless error analysis, depending on the nature of the violation. *See, e.g., Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977) ("In view of the violation of petitioner's Sixth and Fourteenth Amendment right to counsel at the pretrial corporeal identification ..., [we] remand for a determination of whether the failure to exclude that evidence was harmless constitutional error ...."). Therefore, the Illinois Supreme Court was correct in applying a harmless error analysis to Ashford's claim of a denial of due process.

The district court's dismissal of Ashford's petition for a writ of habeas corpus is

AFFIRMED.